1  BROWNE GEORGE ROSS LLP
   Eric M. George (State Bar No. 166403)
2    egeorge@bgrfirm.com
   Michael A. Bowse (State Bar No. 189659)
3    mbowse@bgrfirm.com
   Ira Bibbero (State Bar No. 217518)
4    ibibbero@bgrfirm.com
   Peter Shimamoto (State Bar No. 123422)
5    pshimamoto@bgrfirm.com
   2121 Avenue of the Stars, Suite 2400
6  Los Angeles, California 90067
   Telephone: (310) 274-7100
7  Facsimile: (310) 275-5697

8  Attorneys for Plaintiffs Estate of Robert
   Graham, Chuck Close, Laddie John Dill,
9  and All Others Similarly Situated

10

11              UNITED STATES DISTRICT COURT

12      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

13

| 14 ESTATE OF ROBERT GRAHAM; | Case No. CV11-8604 JHN (FFMx) |
|---|---|

14 ESTATE OF ROBERT GRAHAM;          Case No. CV11-8604 JHN (FFMx)
   CHUCK CLOSE; LADDIE JOHN           Judge Jacqueline Nguyen
15 DILL; individually and on behalf of all
   others similarly situated,          **PLAINTIFFS' OPPOSITION TO
16                                      MOTION TO DISMISS**
               Plaintiffs,
17                                      Judge: Hon. Jacqueline H. Nguyen
           vs.                          Date:  March 12, 2012
18                                      Time:  2:00 p.m.
   SOTHEBY'S, INC., a New York          Crtrm.: 709
19 corporation,
                                        Trial Date: None Set
20             Defendant.

21

22

23

24

25

26

27

28

314841.2

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................... 1

II.   THE MOTION TO DISMISS SHOULD BE DENIED ................. 5

    A.   Standards Controlling Resolution Of This Motion .................. 5

    B.   Defendants' Constitutional Challenges Are Without Merit ......... 6

        1.   The Royalty Act Does Not Violate The Commerce Clause ......... 7

            a.   The Royalty Act Does Not Implicate Interstate Commerce ............................................... 7

            b.   The Royalty Act Does Not Discriminate Against Interstate Commerce ........................................ 8

            c.   The Royalty Act Does Not Directly Control Commerce Occurring Wholly Outside Of California ...... 10

            d.   The Practical Effect Of The Royalty Act Is Not To Control Commerce Outside Of California ..................... 12

            e.   Defendants' Facial Challenge Fails Because The Royalty Act Does Not Directly Regulate Interstate Commerce Under All Circumstances ............................... 15

            f.   The Royalty Act Is Evenhanded, Effectuates Legitimate Local Interests, And Does Not Burden Interstate Commerce ........................................ 16

        2.   The Royalty Act Does Not Violate The Takings Clause ........... 19

            a.   Defendants Have Advanced, Under A "Takings" Label, A Thinly-Disguised Due Process Argument ........ 20

            b.   Even Under A Takings Clause Analysis, The Royalty Act Readily Passes Muster .......................... 22

                (1)   The Royalty Act Is Not A *Per Se* Taking ............. 23

                (2)   Applying The *Ad Hoc* Analysis, No Taking Occurs Under The Act ........................................ 28

    C.   The Royalty Act Is Not Preempted By The 1976 Copyright Act ........ 31

        1.   *Morseburg* Is Controlling ........................................ 31

        2.   Section 301(a) Does Not Preempt The Royalty Act ................. 33

        3.   The First Sale Doctrine Does Not Preempt The Royalty Act ........................................................ 35

-i-

1     D.    Plaintiffs' Prayer For Punitive Damages Is Proper................................ 40

2     E.    The Estate Of Robert Graham Is A Proper Plaintiff............................ 43

3     F.    Plaintiffs Have Sufficiently Pleaded Their Claims............................... 44

4  III.    CONCLUSION ........................................................................... 48

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

1

## TABLE OF AUTHORITIES

2

**Page**

3

### FEDERAL CASES

4

*Addington v. Texas,*
    441 U.S. 418 (1979) ................................................................. 3

5

6

*Altera Corp. v. Clear Logic, Inc.,*
    424 F.3d 1079 (9th Cir. 2005).................................................. 33

7

*Arista Records LLC v. Doe 3,*
    604 F.3d 110 (2d Cir. 2010)..................................................... 46

8

9

*Ascom Hasler Mailing Sys., Inc. v. United States Postal Service,*
    No. 00-1401 (PLF), __ F.Supp.2d __, 2011 WL 4526034 (D.D.C. Sept.
    30, 2011)...................................................................................... 27

10

11

*Associated Film Distributed Corp. v. Thornburgh,*
    520 F.Supp. 971 (E.D. Pa. 1981) .................................... 37, 38, 39

12

*Baby Moose Drawings, Inc. v. Valentine,*
    No. 2:11-CV-00697-JHN-JCGx, 2011 WL 1258529 (C.D. Cal. April 1,
    2011)..................................................................................... passim

13

14

*Bautista v. Los Angeles County,*
    216 F.3d 837 (9th Cir. 2000)..................................................... 48

15

16

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 5444 (2007) ................................................................ 46

17

*Bellaire Corp. v. Shalala,*
    995 F.Supp. 125 (D.D.C. 1997) ................................................ 19

18

19

*Bibb v. Navajo Freight Lines, Inc.,*
    359 U.S. 520 (1959) .................................................................. 17

20

*Black Star Farms LLC v. Oliver,*
    600 F.3d 1225 (9th Cir. 2010)........................................... 7, 9, 12

21

22

*Bobbs-Merrill Co. v. Isidor Straus,*
    210 U.S. 339 (1908) ............................................................ 35, 36

23

*Brown v. Legal Found. of Wash.,*
    538 U.S. 216 (2003) ....................................... 24, 25, 26, 27

24

25

*Buckley v. Evans,*
    No. 2:02-cv-01451-JKS, 2007 WL 2900173 (E.D. Cal. Sept. 28, 2007) ......... 5

26

*Burlington Northern R. Co. v. Dept. of Public Service Regulation,*
    763 F.2d 1106 (9th Cir. 1985)..................................................... 6

27

28

*Burns v. Pennsylvania Dept. of Correction,*
   544 F.3d 279 (3d Cir. 2008)........................................................................29

*Bush v. O'Brien,*
   No. C 09-0947 RS (PR), 2010 WL 3324959 (N.D. Cal. Aug. 23, 2010).......20

*Chevron USA, Inc. v. Cayetano,*
   224 F.3d 1030 (9th Cir. 2000)..............................................................21, 23

*Christensen v. Harris County,*
   529 U.S. 576 (2000)................................................................................37

*City and County of San Francisco v. Market St. Ry. Co.,*
   98 F.2d 629 (9th Cir. 1938)...................................................................3, 10

*Commonwealth Edison Co. v. United States,*
   271 F.3d 1327 (Fed. Cir. 2001)................................................................22

*Concrete Pipe and Products of Cal., Inc. v. Construction Laborers Pension
   Trust for S. Cal.,*
   508 U.S. 602 (1993)..............................................................19, 27, 29, 30

*Connolly v. Pension Benefit Guaranty Corp.,*
   475 U.S. 211 (1986)..........................................................................27, 30

*Conservation Force, Inc. v. Manning,*
   301 F.3d 985 (9th Cir. 2002)...................................................................8, 16

*Davis v. Dept. of Labor and Indus. Wash.,*
   317 U.S. 249 (1942)................................................................................6

*Eastern Enters. v. Apfel,*
   524 U.S. 498 (1998)..........................................................................19, 22

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building and Const. Trades
   Council,*
   485 U.S. 568 (1988)................................................................................28

*Engquist v. Oregon Dept. of Agric.,*
   478 F.3d 985 (9th Cir. 2007)...................................................................22

*F.C.C. v. Florida Power Corp,*
   480 U.S. 245 (1987)................................................................................24

*Fox Film Corp. v. Doyal,*
   286 U.S. 123 (1932)................................................................................39

*Garneau v. City of Seattle,*
   147 F.3d 802 (9th Cir. 1998)..........................................................27, 28, 30

*Gitterman v. Vitoulis,*
   564 F.Supp. 46 (S.D.N.Y. 1982)..........................................................45, 46

*Grantham v. Durant,*
   471 F.Supp.2d 1069 (D. Nev. 2006)..........................................................5

*Gravquick A/S v. Trimble Navigation Int'l Ltd.,*
    323 F.3d 1219 (9th Cir. 2003)..................................................................11, 14, 16

*Healy v. Beer Institute,*
    491 U.S. 324 (1989) ..................................................................................8, 10, 12

*Hill v. U.S.,*
    751 F.Supp. 909 (D. Colo. 1990) ....................................................................... 6

*Horne v. United States Dept. of Agric.*
    No. 10-15270, __ F.3d __, 2011 WL 2988902 (9th Cir. July 25, 2011) ........ 24

*In re Daou Systems, Inc.,*
    411 F.3d 1006 (9th Cir. 2005)............................................................................. 5

*In re Park West Galleries, Inc.,*
    No. 09-2076 RSL, 2010 WL 56044 (W.D. Wash. Jan. 5, 2010)........ 10, 11, 14

*Keystone Bituminous Coal Ass'n v. DeBenedictis,*
    480 U.S. 470 (1987) ......................................................................................... 29

*Laws v. Sony Music Entertainment, Inc.,*
    448 F.3d 1134 (9th Cir. 2006)........................................................................... 34

*Lingle v. Chevron USA, Inc.,*
    544 U.S. 528 (2005) ....................................................................................21, 25

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,*
    416 F.3d 940 (9th Cir. 2005)............................................................................. 48

*Loretto v. Teleprompter Manhattan CATV Corp.,*
    458 U.S. 419 (1982) ....................................................................................23, 25

*Lujan v. G&G Fire Sprinklers, Inc.,*
    532 U.S. 189 (2001) ........................................................................................... 6

*McCarthy v. City of Cleveland,*
    626 F.3d 280 (6th Cir. 2010)........................................................................22, 26

*McClung v. City of Summer,*
    548 F.3d 1219 (9th Cir. 2008)........................................................................... 26

*Mendoza v. Citimortgage, Inc.,*
    No. 10-CV-03550-LHK, 2011 WL 940336 (N.D. Cal. Feb. 18, 2011).......... 48

*Meriden Trust and Safe Deposit Co. v. FDIC,*
    62 F.3d 449 (2nd Cir. 1995).............................................................................. 30

*Midwest Title Loans, Inc. v. Mills,*
    593 F.3d 660 (7th Cir. 2010)........................................................................10, 11, 14

*Moore v. City of Cost Mesa,*
    886 F.2d 260 (9th Cir. 1989)............................................................................ 23

*Morseburg v. Balyon*,
    621 F.2d 972 (9th Cir. 1980)....................................................passim

*Pacific Merchant Shipping Assoc. v. Goldstene*,
    639 F.3d 1154 (9th Cir. 2011).............................................................9

*Penn Cent. Transp. Co. v. City of New York*,
    438 U.S. 104 (1978)...........................................................................29

*People of California v. Kinder Morgan Energy Partners, L.P.*,
    569 F. Supp. 2d 1073 (S.D. Cal. Feb. 29, 2008)...............................5

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970)...........................................................16, 17, 18

*Quality King Distributors, Inc. v. L'Anza Research Int'l, Inc.*,
    523 U.S. 135 (1998)...........................................................35, 36, 38

*Quill Corp. v. North Dakota*,
    504 U.S. 298 (1992)...........................................................................9

*Raymond Motor Transp., Inc. v. Rice*,
    434 U.S. 429 (1978)...........................................................................16

*Reeves, Inc. v. Stake*,
    447 U.S. 429 (1980)...........................................................................2

*Ross v. O'Neal*,
    No. 2:11-cv-06124-JHN-Ex, 2011 WL 5041967 (C.D. Cal. Oct. 17,
    2011)....................................................................................................48

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984)...........................................................................24

*S.D. Myers v. City and County of San Francisco*,
    253 F.3d 461 (9th Cir. 2001).....................................12, 13, 16

*San Antonio Ind. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973)...............................................................................6

*Swisher Int'l, Inc. v. Schafer*,
    550 F.3d 1046 (11th Cir. 2008).....................................................22

*Syverson v. IBM Corp.*,
    472 F.3d 1072 (9th Cir. 2007).............................................5, 43

*U.S. v. Taubman*,
    297 F.3d 161 (2nd Cir. 2002).............................................................1

*UMG Recordings, Inc. v. Augusto*,
    628 F.3d 1175 (9th Cir. 2011).........................................................31

*United States v. Lopez*,
    514 U.S. 549 (1995)...........................................................................2

-vi-

*United States v. Sperry Corp.*,
  493 U.S. 52 (1989) ................................................................. 25

*Unity Real Estate Co. v. Hudson*,
  178 F.3d 649 (3d Cir. 1999) ................................................. 21

*Usery v. Turner Elkhorn Mining Co.*,
  428 U.S. 1 (1976) ..................................................................... 6

*Vance v. Barrett*,
  345 F.3d 1083 (9th Cir. 2003) .......................................... 4, 21

*Washington Legal Found. v. Legal Found. of Wash.*,
  271 F.3d 835 (9th Cir. 2001) ............................................... 29

*Watson v. Buck*,
  313 U.S. 387 (1941) .............................................................. 39

*West Lynn Creamery, Inc. v. Healy*,
  512 U.S. 186 (1994) ............................................................ 8, 9

*West Virginia CWP Fund v. Stacy*,
  No. 11-1020, __ F.3d __, 2011 WL 6062116 (4th Cir. Dec. 7, 2011) ........... 22

*Williamson County Regional Planning Com'n v. Hamilton Bank*,
  473 U.S. 172, 194 (1985) ..................................................... 20

*Wojnarowicz v. American Family Ass'n*,
  745 F. Supp. 130 (S.D.N.Y. 1990) ...................................... 34

*Yee v. City of Escondido*,
  503 U.S. 519 (1992) ............................................................. 24

*Yumul v Smart Balance, Inc.*,
  733 F.Supp.2d 1117 (C.D. Cal. 2010) ................................. 48

**STATE CASES**

*Bainbridge v. Stoner*,
  16 Cal.2d 423 (1940) ........................................................... 47

*Commodore Home Systems, Inc. v. Superior Court*,
  32 Cal.3d 211 (1982) ........................................................... 41

*De Anza Santa Cruz Mobile Estates Homeowners Ass'n v. De Anza Santa
  Cruz Mobiles Estates*,
  94 Cal.App.4th 890 (2001) .............................................. 41, 42

*Durgom v Janowiak*,
  74 Cal. App.4th 178 (1999) ................................................. 34

*Greenberg v. Western Turf Ass'n*,
  140 Cal. 357 (1903) ............................................................. 41

-vii-

*Menefee v. Ostawari*,
    228 Cal.App.3d 239 (1991) ............................................................ 47

*Orloff v. Los Angeles Turf Club*,
    30 Cal.2d 110 (1047) .................................................................... 41

*Robert H. Jacobs, Inc. v. Westoaks Realtors, Inc.*,
    159 Cal.App.3d 637 (1984) ....................................................... 1, 37

*San Remo Hotel v. City and County of San Francisco*,
    27 Cal. 4th 643 (2002) ................................................................. 19

*Small Property Owners of San Francisco v. City and County of San Francisco*,
    141 Cal.App.4th 1388 (2006) ...................................................... 20

*Turnbull & Turnbull v. Ara Transportion, Inc.*,
    219 Cal.App.3d 811 (1990) ..................................................... 41, 42


**FEDERAL STATUTES**

Federal Rules of Civil Procedure, Rule 12(b)(6) .............................. 5

Federal Rules of Civil Procedure, Rule 12(f) ................................... 5


**STATE STATUTES**

California Art Preservation Act,
    Cal. Civ. Code § 987 ................................................................... 42

California Civil Code § 2223 ............................................................ 47

California Civil Code § 2344 ............................................................ 11

California Civil Code § 3294 ..................................................... 40, 43

California Civil Code § 986(f) ........................................................... 1

California Civil Code section 3294 .................................................. 40

California Code of Civil Procedure § 986 ................................ passim

California Code of Civil Procedure § 987 .......................................... 2

California Code of Civil Procedure § 988 .......................................... 2

California Code of Civil Procedure § 989 .......................................... 2

California Code of Civil Procedure section 377.30 .......................... 43

California Probate Code § 552(a) ..................................................... 44

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

1  Resale Royalties Act ................................................................................ passim

2

3  **OTHER AUTHORITIES**

4  1909 Copyright Act ................................................................................. passim

5  1976 Copyright Act ................................................................................. passim

6  EC Directive 2001/84/EC .................................................................................. 1

7  French Code of Intellectual Property, Art. L122-8 ........................................ 1

8  H.R. 2331, 100th Cong., 2nd Sess. (1987) ................................................... 38

9  H.R. 5722, 95th Cong., 2nd Sess. (1978) ..................................................... 38

10  Michael B. Reddy, "The Droit de Suite:  Why American Fine Artists Should
        Have the Right to a Resale Royalty,"
11      15 Loyola of Los Angeles Entertainment Law J. 509, 525 (1995) ................. 39

12  Philippines Republic Act 8293 .......................................................................... 1

13  Racketeer Influenced and Corrupt Organizations Act ........................... 45, 46

14  S. 1619, 100th Cong., 2nd Sess. (1986) ....................................................... 38

15  S. 2796, 99th Cong., 2nd Sess. (1986) ......................................................... 38

16  U.S. Constitution, Amendment V .................................................................. 20

17  U.S. Constitution, Article I, § 8, cl. 3 ............................................................ 7

18  Visual Artists Rights Act of 1990 .................................................................. 39

19

20

21

22

23

24

25

26

27

28

# I.   **INTRODUCTION**

The State of California in 1976 adopted – and the following year implemented – the Resale Royalty Act ("Royalty Act" or "Act"), an act patterned after the law of France (and also resembling artist royalty laws adopted in Europe and, later, the European Union and the Philippines).[1]

Over the ensuing 35 years – during which time artists, art sellers, art dealers, art brokers, auction houses and the California Arts Council have followed and made the Act part of the firmament of California law – Sotheby's and Christie's have complacently elected not to follow the Act.  Whether by coincidence or design[2], these two auction houses willfully and repeatedly chose to violate the Act . . . when the Ninth Circuit rejected constitutional challenges brought against the Act, *see Morseburg v. Balyon*, 621 F.2d 972, 979 (9th Cir. 1980) . . . when California's appellate courts published decisions concerning the Act, *see, e.g., Robert H. Jacobs, Inc. v. Westoaks Realtors, Inc.*, 159 Cal.App.3d 637 (1984) . . . when California's legislature from time to time modified and affirmed the Act, *see* Cal. Civ. Code § 986(f) . . . when Your Honor recently rejected a Copyright Act preemption challenge (*Baby Moose Drawings, Inc. v. Valentine*, No. 2:11-CV-00697-JHN-JCGx, 2011 WL 1258529 (C.D. Cal. April 1, 2011) . . . and without ever seeking legislative modification, or themselves challenging the Act (by way of declaratory relief or otherwise).

---

[1]  In *Morseburg, infra*, Judge Sneed observed for the Ninth Circuit that "we would ignore a national characteristic were we to say that an act modeled upon a French law lacked a rational basis." 621 F.2d at 979. *See also* French Code of Intellectual Property, Art. L122-8; EC Directive 2001/84/EC; Philippines Republic Act 8293.

[2]  *See U.S. v. Taubman*, 297 F.3d 161 (2nd Cir. 2002) (affirming Sotheby's chairman's conviction for conspiring with Christie's chairman to fix auction prices in violation of the Sherman Act).

1    With evasion now no longer an option, Sotheby's and Christie's advance the

2  proposition that – from the moment of the 1976 passage of the Act, against which

3  the defendants vigorously and unsuccessfully lobbied – the Act has all along been

4  unconstitutional.

5    This position, while financially and otherwise convenient for the two

6  defendant auction houses, misunderstands the federalist constitutional structure that

7  vests states with police powers to advance the citizenry's welfare through arts

8  promotion, and also misstates with abandon the constitutional jurisprudence

9  underpinning each of the challenges now advanced.  As set forth in detail as follows,

10  this Court should decline defendants' activist invitation to reach out to invalidate

11  California's properly-enacted legislation.

12    Under our federal constitutional system of government, California is

13  empowered to promote the arts through legislation affecting sales of art <u>in</u>

14  California, and <u>by</u> California sellers.  (Notably, while the Act reaches both such

15  situations, the motion to dismiss does not purport to challenge the former – those

16  sales taking place in California – component of the Act.)  The Act – an "economic

17  regulation to promote artistic endeavors," *Morseburg*, 621 F.2d at 979, that forms

18  part of a comprehensive set of laws encouraging the creation and protection of fine

19  art (*see* Cal. Code Civ. Proc. §§ 986, 987, 988, 989) – arises from an exercise by

20  California of its sovereign police powers, which are themselves rooted in the federal

21  constitution's promise of federalism.  *See United States v. Lopez*, 514 U.S. 549, 552

22  (1995) (states' entry into the union involved delegating certain specifically

23  enumerated powers to the federal government and retaining for themselves of

24  powers that are "numerous and indefinite"); U.S. Const. amend. X ("The powers not

25  delegated to the United States by the Constitution, nor prohibited by it to the States,

26  are reserved to the States respectively, or to the people"); *Reeves, Inc. v. Stake*, 447

27  U.S. 429, 441 (1980) ("'It is one of the happy incidents of the federal system that a

28

single courageous State may, if its citizens choose, serve as a laboratory; and try novel . . . economic experiments without risk to the rest of the country.'").[3]

Equally and necessarily true – as stated in obverse – is the inapplicability of those constitutional doctrines defendants now invoke to stretch to cover and invalidate the Act. Defendants' approach (seemingly raising all conceivable challenges not reached in *Morseburg*) ostensibly hopes that some challenge – any challenge – will stick. But their all-but-the kitchen sink exercise necessarily fails. To begin with, the myriad baffling assumptions (about the supposed adverse impacts of the law) woven throughout defendants' arguments are belied by the survival (indeed, viability) of the California and national art market throughout the Act's 35-year history. Equally hyperbolic – and hollow-ringing – are defendants' projected administrative problems with the Act (*e.g.* determining the residency of the very sellers for whom the auction houses have agreed to serve as agents ?!).

It is defendants' exaggerated depiction of constitutional jurisprudence, however, that most fundamentally disposes of their motion. Though the stuff of zealous advocacy, defendants' arguments simply overstate the true reach of the constitutional doctrines they invoke:

- The Act does not violate the dormant commerce clause. Even were it found to implicate that clause, it is neither a direct regulation of interstate commerce nor a regulation whose burden on interstate commerce outweighs its local benefits.

---

[3] As this Court is well familiar, said powers "may be exercised with respect to many subjects, including: the safety, health, morals, convenience, happiness, prosperity, peace, education, property, the general or common good, the well-being, comfort and good order of the people, increase of industries, and development of resources." *City and County of San Francisco v. Market St. Ry. Co.*, 98 F.2d 629, 632 (9th Cir. 1938); *Addington v. Texas*, 441 U.S. 418, 431 (1979) ("essence" of federalism "that states must be free to develop a variety of solutions to problems and not be forced into a common, uniform mold.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- The Act does not infringe upon anyone's Fifth Amendment rights.  The Ninth Circuit decided three decades ago that the Act does not violate the Due Process Clause of the Fifth Amendment.  *Morseburg*, 621 F.2d at 979-80 ("In its present form, [the Royalty Act] does not affect fundamental rights.").

- The Act does not violate the Takings Clause.  In fact, though cast as a Takings Clause challenge, defendants' arguments actually raise a Due Process challenge since their true complaint is not whether compensation is due from the government when a royalty is paid to an artist, but whether California can require the payment of a royalty at all.  *Vance v. Barrett*, 345 F.3d 1083 (9th Cir. 2003) (Takings Clause merely requires compensation when private property is taken for public use, while Due Process Clause defines what the government may do at all).  Even under the Takings Clause, the Royalty Act does not effect a "taking" within the meaning of the Fifth Amendment for many reasons, including that the five percent of artwork sale proceeds does not have the "substantial" property impact necessary to constitute a "taking."

- The Act is not preempted by the Copyright Act.  The arguments defendants assert here are the same ones rejected by the Ninth Circuit in *Morseburg* and by this Court in *Baby Moose*.  As both cases held, the Royalty Act imposes obligations that are entirely separate from the rights granted by the federal Copyright Act.  The Royalty Act requires only that the artist who created the work of fine art receive a five percent royalty.  It does not grant the artist any right to prevent the sale of a work of fine art.  Thus, there is no preemption.

Defendants' motion is an ostensible effort to avoid discovery that, plaintiffs submit, will show a systematic effort to knowingly evade the Royalty Act for all but

-4-

1   a few favored artists (not including the named plaintiffs) for whom defendants have

2   seen fit to follow the law.

3          Defendants' other arguments, as described below, are equally without merit.

4   **II.    THE MOTION TO DISMISS SHOULD BE DENIED**

5          **A.    Standards Controlling Resolution Of This Motion**

6          Rule 12(b)(6) motions are "disfavored" (*Buckley v. Evans*, No. 2:02-cv-

7   01451-JKS, 2007 WL 2900173, at *1 n.2 (E.D. Cal. Sept. 28, 2007)), and mandate

8   liberal construction of the applicable complaint, with all well-pleaded facts accepted

9   as true. *Syverson v. IBM Corp.*, 472 F.3d 1072, 1075 (9th Cir. 2007).[4]

10         Equally plain, because Rule 12(b)(6) motions challenge a complaint on but a

11  single ground – *i.e.* that the complaint "fail[s] to state *a claim* upon which relief can

12  be granted," Fed. R. Civ. Proc. 12(b)(6) (emphasis added) – where a cause of action

13  states <u>any basis</u> for a claim, the motion to dismiss that cause of action must <u>in its</u>

14  <u>entirety</u> denied.  So long as sufficient facts are alleged to entitle a plaintiff to <u>some</u>

15  relief, a motion to dismiss must be denied. *Grantham v. Durant*, 471 F.Supp.2d

16  1069, 1073 (D. Nev. 2006) ("A claim is sufficient if it shows that the plaintiff is

17  entitled to any relief which the court can grant, even if the complaint asserts the

18  wrong legal theory or asks for improper relief.").[5]  To challenge a portion of a cause

19  of action, or to have only a portion of a cause of action excised from an action,

20  defendants must file a motion to strike under Rule 12(f). *See Hill v. U.S.*, 751

21

---

22  [4]   Even where dismissal is warranted, it is generally without prejudice, unless it is
23  clear that the complaint cannot be saved by any amendment. *See, e.g., In re Daou
     Systems, Inc.*, 411 F.3d 1006, 1013 (9th Cir. 2005).
24

25  [5]   Motions under 12(b)(6) are not a permissible means to challenge one portion of a
     cause of action or the availability of a particular form of relief prayed for in
26  connection with a claim. *See People of California v. Kinder Morgan Energy
     Partners, L.P.*, 569 F. Supp. 2d 1073, 1082 n.2 (S.D. Cal. Feb. 29, 2008) (holding
27  challenge to relief sought on a cause of action improper on a motion to dismiss).

28

1    F.Supp. 909, 910-11 (D. Colo. 1990) ("Rule 12(b)(6) is not the appropriate vehicle
2    to strike objectionable portions of a complaint.").

3    **B.    Defendants' Constitutional Challenges Are Without Merit**

4    Defendants' constitutional challenges – asserting that the Royalty Act violates
5    the Commerce and Takings Clauses – are without merit.

6    As a threshold matter, each of the foregoing constitutional arguments – by
7    implicating this country's federal-state dynamic – must overcome a strong
8    presumption of constitutionality accorded to the Royalty Act. *San Antonio Ind. Sch.*
9    *Dist. v. Rodriguez,* 411 U.S. 1, 44 (1973); *Davis v. Dept. of Labor and Indus. Wash.,*
10   317 U.S. 249, 257 (1942) (acknowledging "the presumption of constitutionality in
11   favor of the state statute"); *Burlington Northern R. Co. v. Dept. of Public Service*
12   *Regulation,* 763 F.2d 1106, 1109 (9th Cir. 1985) (holding "statutes are presumed to
13   be constitutional").

14   This presumption is particularly strong where, as here, state law merely
15   adjusts the burden and benefits of economic life between its citizens. *Usery v.*
16   *Turner Elkhorn Mining Co.,* 428 U.S. 1, 15 (1976) (holding it "well established that
17   legislative Acts adjusting the burdens and benefits of economic life [are afforded] a
18   presumption of constitutionality"); *see Morseburg,* 621 F.2d at 979 (Act constitutes
19   an "economic regulation to promote artistic endeavors"). As such, any person who
20   challenges a statute by arguing that it is unconstitutional bears a heavy burden of
21   proof. *Lujan v. G&G Fire Sprinklers, Inc.,* 532 U.S. 189, 198 (2001).

22   The burden defendants face here is insurmountable in light of the Ninth
23   Circuit's previous rejection of similar challenges *Morseburg.* There, the court
24   considered and rejected arguments that the Act violated the Contracts Clause found
25   in Article I and the Due Process Clause of the Fifth Amendment. 621 F.2d at 978-
26   80. Central to *Morseburg* were the court's findings that the Royalty Act "serves a
27   public purpose" and does not significantly impair the economic interests of those
28   who are obligated to pay royalties under the Act. *Id.* at 979 ("If impairment there

1  be, which we are not prepared to concede, it is not of that magnitude.  The

2  obligation of the appellant created by the California Act serves a public purpose and

3  is not severe.").  Also key to the Ninth Circuit's decision was the finding that the

4  Royalty Act is an <u>economic</u> regulation entitled to great deference.  *Id.* ("We view

5  the California Act, whatever its merits as a legislative matter, as economic

6  regulation to promote artistic endeavors generally. . . . [L]egislative Acts adjusting

7  the burdens and benefits of economic life come to the Court with a presumption of

8  constitutionality." (citation and quotation omitted)).

9       Although defendants here purport to challenge the Royalty Act under

10  different constitutional clauses, these holdings by *Morseburg* fatally undermine

11  defendants' contentions.

12          **1.**    **<u>The Royalty Act Does Not Violate The Commerce Clause</u>**

13       Defendants' facial challenge to the Royalty Act under the Commerce Clause,

14  *see* U.S. Const., Art. I, § 8, cl. 3, is wrong on many bases:  (i) the Commerce Clause

15  is not implicated by the Royalty Act; (ii) if it is, the Royalty Act does not

16  discriminate against interstate commerce; the Act does not control interstate

17  commerce either (iii) directly or (iv) in practical effect; (v) the facial challenge fails

18  because, even if there are some conceivable circumstances under which the Act may

19  be invalid, there also exist circumstances under which it is valid; and (vi) even were

20  the Commerce Clause to be implicated here, the Act is an evenhanded regulation

21  that effectuates legitimate local interests and imposes little or no burden on interstate

22  commerce.

23          **a.**    **<u>The Royalty Act Does Not Implicate Interstate</u>**

24               **<u>Commerce</u>**

25       The "dormant Commerce Clause" is the """"negative" aspect that denies the

26  States the power unjustifiably to discriminate against or burden the interstate flow of

27  articles of commerce.""" *Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1230 (9th

28  Cir. 2010).  On its face, the Royalty Act does not fall within this doctrine because it

1   regulates only the conduct of California residents, namely the sellers of artworks, or

2   art sales that occur within California.[6]

3        "To determine whether the dormant Commerce Clause is applicable, we ask

4   . . . whether the activity . . . has a 'substantial effect' on interstate commerce such

5   that Congress could regulate the activity." *Conservation Force, Inc. v. Manning*,

6   301 F.3d 985, 993 (9th Cir. 2002).

7        Defendants concede that the funds plaintiffs seek from them by these lawsuits

8   are not their property, but property they "hold in trust" for the sellers of the

9   artworks, who are residents of California. (Motion to Dismiss ("MTD") at 21:14-

10  19.) Therefore, the sole challenged aspect of the Royalty Act is California's right to

11  require its own residents to pay a portion of their own income – from sales of

12  artwork – to artists. Viewed in this light, the Royalty Act does not regulate an

13  activity that has a substantial effect on interstate commerce. Therefore, the dormant

14  Commerce Clause does not apply here.

15       **b.    <u>The Royalty Act Does Not Discriminate Against</u>**

16             <u>**Interstate Commerce**</u>

17       Should the Court find that the Royalty Act affects interstate commerce, it

18  should determine that it does not discriminate against such commerce.

19       The dormant Commerce Clause "'prohibits economic protectionism – that is,

20  regulatory measures designed to benefit in-state economic interests by burdening

21  out-of-state competitors.'" *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 192

22  (1994). A state law "that 'discriminate[s] against interstate commerce "either on its

23  face or in practical effect"'" is "unconstitutional unless it '"serves a legitimate local

24  purpose," and . . . this purpose could not be served as well by available

25  ────────────────────────

    [6]   Defendants do not challenge the constitutionality of the Royalty Act with respect
26  to sales occurring in California. Their Commerce Clause attack is premised on the
    portion of the Act that relates to sales by California sellers that may occur outside of
27  California. (MTD at 8:22-24, 9:14-15, 10:15-16, 11:18-20.)

28

1  nondiscriminatory means.'" *Black Star Farms*, 600 F.3d at 1230.  "For the purposes

2  of the dormant Commerce Clause, '"discrimination" simply means *differential*

3  *treatment* of in-state and out-of-state economic interests that benefits the former and

4  burdens the latter.'"  *Id.* (underlining added); *Pacific Merchant Shipping Assoc. v.*

5  *Goldstene*, 639 F.3d 1154, 1177 (9th Cir. 2011) (same); *Quill Corp. v. North*

6  *Dakota*, 504 U.S. 298, 312 (1992) (holding that dormant Commerce Clause

7  "prohibits discrimination against interstate commerce") (emphasis added).

8       The Royalty Act does not "discriminate" as that term is used in connection

9  with the dormant Commerce Clause.  It is not a "a protective tariff or customs duty,

10  which taxes goods imported from other States, but does not tax similar products

11  produced in State," which the Supreme Court has called "[t]he paradigmatic

12  example of a law discriminating against interstate commerce . . . ."  *West Lynn*

13  *Creamery*, 512 U.S. at 193.  It does not impose differential treatment because it

14  treats all art sales by California residents (or that take place in California) the same.

15       If anything, the burden of the law falls more heavily on Californians than on

16  residents of other states.  In the words of the Register of Copyrights, insofar as the

17  Court gives any weight to that officer's opinion, the Royalty Act "place[s] the

18  California art marketplace 'at a competitive disadvantage in relation to the markets

19  in other states . . . .'"  (Declaration of Jason D. Russell, doc. # 16-1 ("Russell

20  Decl."), Ex. 27 at 74.)  Common sense leads to the same conclusion: if, for

21  example, one of the defendants auctioned two artworks in New York, one owned by

22  a Californian and one by a New Yorker, the Californian would be relatively

23  disadvantaged by the Royalty Act because she – and not the New Yorker – might be

24  required to pay five percent of the proceeds to the artist.

25       In this sense the Royalty Act falls squarely within the realm of California's

26  police powers.  As noted above, a state's police powers encompass areas including

27  "the safety, health, morals, convenience, happiness, prosperity, peace, education,

28  property, the general or common good, the well-being, comfort and good order of

-9-

1   the people, increase of industries, and development of resources." *Market St. Ry.*

2   *Co.*, 98 F.2d at 632. The right to promote the arts by granting artists a royalty on the

3   resale of their works falls within these power in several respects. Therefore, the

4   Royalty Act falls not only outside of the protection of the dormant Commerce

5   Clause, but within the scope of the legitimate powers retained by California under

6   the Tenth Amendment.

7            **c.      The Royalty Act Does Not Directly Control Commerce**

8                      **Occurring Wholly Outside Of California**

9            Defendants assert, however, that the Royalty Act runs afoul of the dormant

10  Commerce Clause because it directly regulates interstate commerce by regulating art

11  sales that occur outside California. (MTD at 9-10.) "[A] statute that directly

12  controls commerce occurring wholly outside the boundaries of a state exceeds the

13  inherent limits of the enacting State's authority and is invalid . . . . The critical

14  inquiry is whether the practical effect of the regulation is to control conduct beyond

15  the boundaries of the State." *Healy v. Beer Institute*, 491 U.S. 324, 336 (1989).

16  Defendants liken this case to *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th

17  Cir. 2010), and *In re Park West Galleries, Inc.*, No. 09-2076 RSL, 2010 WL 56044

18  (W.D. Wash. Jan. 5, 2010), in which plaintiffs sought to apply their home state's

19  consumer protection laws to transactions occurring outside of their states.

20           Those cases are plainly distinguished. There, the transactions took place

21  geographically outside of the state whose consumer protection laws were to be

22  applied, and the defendants themselves had no connection with the plaintiffs' home

23  state. In *Midwest Title*, Indiana sought to impose its consumer protection laws on an

24  Illinois loan company loaning money in person in Illinois (albeit to, in some cases,

25  Indiana residents) and giving the borrowers checks drawn on an Illinois bank. 593

26  F.3d at 662. In *Park West*, the plaintiffs included a (presumed) Florida resident

27  seeking to impose Florida's consumer protection laws to transactions that occurred

28  at sea. 2011 WL 56044, at *2-*4. In neither case did the party upon whom the legal

1   duties were sought to be imposed have anything to do with the state creating those

2   duties; the only nexus with the state was that the consumer was from the state.

3   Here, on the other hand, defendants are holding money in trust for their sellers,

4   residents of California.  (MTD at 21:14-19.)

5      The nexus between California and the sellers here is undeniable:  they reside

6   in the state.[7]  This is a not a case where the statute at issue "regulate[s] the actions of

7   parties located in other states, [since] it regulates the contractual relationships in

8   which at least one party is located in California."  *Gravquick A/S v. Trimble*

9   *Navigation Int'l Ltd.*, 323 F.3d 1219, 1224 (9th Cir. 2003).  Here, defendants

10  entered into a contract with California sellers, and the Royalty Act regulates the

11  relations between them.

12     Nor is this like *Park West*, where the <u>buyer</u> sought to impose his home state

13  protections on an out-of-state seller, or, as *Park West* put it, where the buyer claimed

14  that his state's protections "travel with him wherever he goes, such that a shop

15  owner in Milan, a tour guide in Costa Rica, and an auctioneer in the Baltic Sea are

16  all required to comply with the statute if their customer is a Florida resident."  *Park*

17  *West*, 2010 WL 56044, at *4.  This is instead a case where an artist seeks to impose

18  the protections of California's Royalty Act on a seller who resides in California, but

19  whose money is held by an out of state trustee.  The situation is the reverse of *Park*

20  *West*:  there, the obligee sought to project his state law on a foreign obligor; here,

21  obligees seek to enforce California law on a local obligor.  And it is beyond question

22  that when defendants receive the royalties in trust for the sellers, and the artists are

23  entitled to those royalties, defendants are obligated to deliver the funds to the artists.

24  *See, e.g.,* Cal. Civ. Code § 2344.

25

26  [7]  The evidence will show that defendants also each have a significant presence in

27  California.  Thus, the analogy to *Midwest Title* and *Park West* is even more
    attenuated.

28

This nexus also shows that the Royalty Act is <u>not</u> a statute that "directly controls commerce occurring wholly outside the boundaries of a State . . . ." *Healy*, 491 U.S. at 336. To the contrary, while part of the transaction may occur outside of California, it cannot be said that the transaction occurs "wholly outside" of California because the seller is necessarily a state resident.

### d.   The Practical Effect Of The Royalty Act Is Not To Control Commerce Outside Of California

Defendants also assert that the "practical effect" of the Royalty Act is to control commerce beyond California. (MTD at 11-13.) They cannot prevail on this point.

When considering a "practical effects" challenge, courts look not at whether a statute "*might* turn out down the road to be at odds with our constitutional prohibition against state laws that discriminate against Interstate Commerce. The proof of the pudding here must be in the eating, not in the picture on the box as see through the partial eyes of the beholder – which is especially true in a case where neither facial economic discrimination nor improper purpose is an issue." *Black Star Farms*, 600 F.3d at 1232. "In other words, prove it or lose it." *Id.*

Defendants assert that the Royalty Act must be considered in light of what might happen if other states pass similar laws, and that the Court must infer that other states that have considered and rejected royalty acts have expressed a policy that no such royalty should apply to sales in their states. Defendants read too much into failed legislation. Legislation may fail due to politics, policy or any number of reasons.

More significantly, the defendants "must either present evidence that conflicting, legitimate legislation is already in place or that the threat of such legislation is both actual and imminent." *S.D. Myers v. City and County of San Francisco*, 253 F.3d 461, 469-70 (9th Cir. 2001); *Black Star Farms*, 600 F.3d at 1233 ("Plaintiffs must offer substantial evidence of an actual discriminatory effect

1   in order to take advantage of heightened scrutiny . . . .")   "[T]he [Supreme] Court

2   has never invalidated a state or local law under the dormant Commerce Clause

3   based upon mere speculation about the possibility of conflicting legislation."

4   *Myers*, 253 F.3d at 470.   In *Myers*, an ordinance was upheld against an attack

5   similar to defendants' because the defendant there "had not brought to our attention

6   any actual or pending legislation that conflicts or could conflict" with the ordinance

7   at issue.   *Id.* at 470-71.

8          Here, defendants assert that fifteen states purportedly considered but declined

9   to enact resale royalty acts.   (MTD at 12-13.)   None of this legislation is "actual,"

10   and all but New York's were considered 19 to 35 years ago.   (MTD at 12 n.5, citing

11   Russel Decl., Ex. 27-31, publications from 1977 through 1993.)[8]   Defendants proffer

12   evidence that New York has considered resale royalties twelve times between the

13   1970s and 2010.   (MTD at 13:1-3.)   It is clearly not the case in New York that "the

14   threat of such legislation is both actual and imminent."   *Myers*, 253 F.3d at 469-70.

15          Moreover, "it is significant to our 'direct regulation' inquiry that [California]

16   imposes the [Royalty Act] through contract rather than by legislative fiat."   *Myers*,

17   253 F.3d at 469.   *Myers* was a dormant Commerce Clause challenge to San

18   Francisco's ordinance requiring contractors with that city to provide the same

19   benefits to employees with domestic partners as it provides to employees with

20   spouses.   The ordinance applied to the contractor's employees working in the city

21   and to those employees working on city contracts anywhere in the United States.   *Id.*

22   at 465, 469.   In rejecting the challenge, the Ninth Circuit gave weight to the fact that

23   the ordinance will affect an out-of-state contract only after that contractor "has

24   affirmatively chosen to subject itself to the Ordinance by contracting with the City."

25   ────────────
    [8]   Moreover, as argued in the opposition to defendants' request for judicial notice,

26   the Court should not take judicial notice of the documents relied upon by

27   defendants, and if it does, it should not accept them for the truth of the matters
    asserted as they are all hearsay.

28

1   *Id.* at 469.  So, too, here, as defendants are not being subject to the Royalty Act by

2   legislative fiat, as sought in *Midwest Title* and *Park West Galleries*, but because they

3   chose to contract with a California seller.  Defendants voluntarily took on the

4   responsibility to collect resale royalties and hold them in trust when they agreed to

5   sell the property of a Californian.  They should not be heard to complain about the

6   effect of the law on their principals after earning commissions on such sales.

7        Also on point is *Gravquick*, 323 F.3d 1219.  There, a Danish company

8   contracted with a California manufacturer to buy global positioning system devices.

9   *Id.* at 1221.  When the defendant failed to renew the contract, the plaintiff sued,

10  alleging violation of a California law requiring good cause and notice before

11  nonrenewal.  *Id.*  The California company, seeking to avoid the effect of the statute,

12  brought a dormant Commerce Clause challenge, which was rejected.  The statute did

13  not "violate the Commerce Clause by directly regulating commerce entirely outside

14  of California, because the contract here is, by the parties' choice, governed by

15  California law, was performed in part in California, and involves a California

16  corporation." *Id.* at 1224.  Here, although defendants and their sellers (may or) may

17  not have contracted to be governed by California law, the relationship between

18  defendants and their California sellers is one by contract, one of the parties is a

19  Californian, and at least that party (the principal, for which defendant is the agent

20  and trustee, *see* MTD at 21:14-19) is bound by California law.  For the same reasons

21  application of the statute in *Gravquick* did not violate the Commerce Clause, the

22  Royalty Act passes muster here.

23       *Gravquick* also disposes of two other objections defendants raise.  First, there

24  is no infirmity under the Commerce Clause where parties voluntarily enter a

25  contract that is potentially covered by the laws of two states.  "This burden,

26  however, is not any greater than that imposed in any case where a contract is formed

27  between parties located in two different states." *Gravquick*, 323 F.3d at 1225.

28  Second, "in every case in which one state's law is applied to contracts involving

-14-

1  parties from other states, one state's law is, in a sense, being 'exported.'  The

2  [statute] creates no greater burden on interstate commerce than any other law

3  regulating contracts." *Id*.  Therefore, because defendants contracted with California

4  sellers, who were bound by California law including the Royalty Act, defendants

5  should not be heard to argue that the Commerce Clause is violated where California

6  law is applied to a transaction taking place in New York, or where there may be a

7  potential conflict between California law and that of any other jurisdiction.

8            e.    **Defendants' Facial Challenge Fails Because The**

9                  **Royalty Act Does Not Directly Regulate Interstate**

10                 **Commerce Under All Circumstances**

11           Defendants challenge the Royalty Act on its face (asserting that it directly

12  violates the Commerce Clause regardless of whom it is applied to), but they cannot

13  meet the requisite "high burden of proof," *Meyers*, 253 F.3d at 467, especially here

14  where they are challenging the Act merely on the pleadings.  To prevail on a facial

15  challenge, defendants "must 'establish that no set of circumstances exists under

16  which the [Royalty Act] would be valid.  The fact that [the Royalty Act] might

17  operate unconstitutionally under some conceivable set of circumstances is

18  insufficient to render it wholly invalid.'" *Id*.

19           Here, of course, there is no question that the Royalty Act is valid when

20  applied to sales that occur in California (again, a component of the Act not

21  challenged here).  That should be sufficient to dispose of defendants' challenge.[9]

22           But the Royalty Act is also valid for out-of-state sales by California residents.

23  As argued above, there is no infirmity in applying the statute generally to such sales.

24  Conceivably, too,  a court could construe the Royalty Act narrowly.  *See, e.g.*,

25

26  [9]   Should the Court find – which it should not – that the Royalty Act cannot be

27  applied to out-of-state sales, that portion of the Act may be excised.  Cal. Civ. Code
     § 986(e) (severability clause).

28

*Gravquick,* 323 F.3d at 1224 (no Commerce Clause infirmity where parties agree to be bound by law imposing extraterritorial obligation).  In *Myers,* the court construed the ordinance at issue narrowly and held that because the challenger was unable prove that the ordinance so construed conflicted with actual or pending laws in other jurisdictions, the ordinance withstood the attack.  *Id.* at 469-71.  Here, even if the Royalty Act is invalid under a broad construction, it does not offend the Commerce Clause under the narrow constructions described above, and defendants have proffered no evidence that compels a different result.

**f.     The Royalty Act Is Evenhanded, Effectuates Legitimate Local Interests, And Does Not Burden Interstate Commerce**

As shown above, the Royalty Act does not regulate commerce, and if it does, it does not discriminate against out-of-state commercial interests, either on its face or in practical effect.  If, as here, a state law regulates evenhandedly, "the regulation is valid unless the plaintiff can show that it imposes a burden on interstate commerce 'clearly excessive in relation to the putative local benefits.'" *Conservation Force,* 301 F.3d at 995, quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970).  Thus, applying the *Pike* balancing test, an evenhanded statute is presumptively valid unless the challenging party proves that the actual burden outweighs the putative benefits.

Insofar as the Royalty Act regulates commerce, it satisfies this test.

First, it regulates evenhandedly.  Defendants do not argue otherwise.  On its face, it applies to all art sales by California sellers or that take place in California.

Second, defendants failed to prove that the Royalty Act burdens interstate commerce, and indeed it would be improper to do so on the pleadings.  In the cases defendants rely upon, the *Pike* balancing was based on actual evidence, not surmise. *See, e.g., Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 438 (1978) ("Appellants also produced uncontradicted evidence showing that their operations

-16-

1   are disrupted, their costs are raised, and their service is slowed by the challenged

2   regulations."); *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 528 (1959) (noting

3   the "rather massive showing of burden on interstate commerce which appellees

4   made at the hearing"). Defendants present only surmise. For this reason, their

5   challenge must fail.

6        Third, even the burden Defendants hypothesize is slight, if it exists at all.

7   Defendants suggest that the imposition of a royalty "discourages sales by increasing

8   the cost of art . . . ." Many factors influence the price of art, including the state of

9   the economy and the reputation of the artist. One potentially significant factor is the

10   "sales commissions" imposed by defendants and "incurred by the seller . . . ."

11   (MTD at 15 n.7.) There is no evidence at this stage about the significance of the

12   burden, if any imposed by Royalty Act, especially as compared to the burdens

13   imposed by Defendants' sales commissions and other factors. Therefore it is not

14   possible to evaluate the burden side of the *Pike* balance on the pleadings alone.

15        The other burdens defendants hypothesize are similarly incalculable at this

16   point. (See MTD at 15-16.) Defendants suggest that it is a burden to determine the

17   seller's residence, but that can be ascertained instantly (and probably already is)

18   when the seller enters into a contract with one of the defendants. Defendants

19   suggest it is a burden to determine and track the artists' citizenship, residence and

20   lifespan. Plaintiffs submit the evidence will show that that information can be

21   obtained easily using search tools available on the Internet. Finally, defendants

22   assert that it would burden them to "undertake some form of effort to locate the

23   artist." (MTD at 15-16.) The Royalty Act does not prescribe what effort

24   Defendants must take, but it does permit them to turn royalties over to the Arts

25   Council once defendants have completed whatever effort they care to undertake.

26   Cal. Civ. Code § 986(a)(2). Conceivably, therefore, a minimal effort will suffice.

27        In sum, defendants have not shown that the Royalty Act burdens commerce.

28

1    Nor have defendants shown that these unascertained burdens outweigh the

2   other side of the *Pike* balance – the putative benefits. *Pike*, 397 U.S. at 142.

3   Defendants mainly argue that the Royalty Act does not provide local benefits

4   because some of the artists who may benefit from the Act do not reside in

5   California.  Not only do defendants fail to support this assertion with evidence, thus

6   dooming their challenge on this front as well, but they take a shortsighted,

7   provincial view that ignores the many interests which California could putatively be

8   advancing by the Royalty Act.  Of course, the Ninth Circuit already held that the

9   Royalty Act is an "economic regulation to promote artistic endeavors." *Morseburg*,

10  621 F.2d at 979.  That finding continues to ring true for many reasons.  First, the

11  welfare of California artists is advanced.  Second, the welfare of out-of-state artists

12  that have contributed to the arts in California is advanced – indeed, the very fact that

13  a California resident is selling the artwork shows that the artwork made some impact

14  on California.  Third, the interest of the state in promoting the arts is advanced by

15  the royalties that are deposited with the Arts Council and not claimed by or

16  distributed to the artist within seven years.  Cal. Civ. Code § 986(a)(5).  Fourth, the

17  same interest is advanced generally because it is likely that artists supported by

18  resale royalties will be better able to devote their efforts to creating art and some of

19  that art is likely to end up in California; indeed, enforcement of the Act may result

20  in an increase in art in California because artists will have a financial incentive to

21  have their art owned by Californians or sold in California.  Finally, the financial

22  welfare of the state as a whole is advanced by the interest earned on royalties

23  deposited with the Arts Council pending location of the artist.  While other reasons

24  could be proffered, plaintiffs submit that at the pleading stage, this list is sufficient

25  to show that the Royalty Act should be upheld because defendants have not proven

26  that any burden on interstate commerce is excessive in relation to the putative local

27  benefits.  *Pike*, 397 U.S. at 142.

28

1      **2.     The Royalty Act Does Not Violate The Takings Clause**

2          Defendants' contention that the Royalty Act violates the Takings Clause of

3     the Fifth Amendment, and corresponding provisions in the California constitution[10],

4     is both misguided (because it is in fact a thinly-disguised due process argument,

5     which *Morseburg* has rejected) and meritless (because any impact the Act has on art

6     owners' interests in their artwork, or in the proceeds from artwork sales, are too

7     insubstantial to qualify as a "taking").

8          To begin with, in challenging the Royalty Act as violating the Fifth

9     Amendment's Takings Clause, defendants face a particularly steep burden.  Apart

10    from the above-recited presumptions of constitutionality (which are particularly

11    severe where "a party [is] challenging governmental action as an unconstitutional

12    taking," *Eastern Enters. v. Apfel*, 524 U.S. 498, 523 (1998)), *Morseburg's* holding

13    that the Act passes muster under the Fifth Amendment's Due Process Clause raises

14    the bar even further for defendants' Fifth Amendment Takings Clause challenge.

15    This is so because a statute that does not violate the Due Process Clause of the Fifth

16    Amendment ordinarily will also not violate the Takings Clause of the Fifth

17    Amendment.  *See Concrete Pipe and Products of Cal., Inc. v. Construction*

18    *Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 641 (1993) ("Given that Concrete

19    Pipe's due process arguments are unavailing, it would be surprising indeed to

20    discover the challenged statute nonetheless violating the Takings Clause." (citation

21    and quotation omitted)); *Bellaire Corp. v. Shalala*, 995 F.Supp. 125, 141 (D.D.C.

22    1997) (noting the connection between due process and takings clause analyses).

23

24

25    _____
      [10]   The federal and California Takings Clauses are ordinarily construed to be

26    congruent.  *San Remo Hotel v. City and County of San Francisco*, 27 Cal. 4th 643,
      664 (2002) (apart from California's coverage of "damage" to property in addition to

27    "taking" property, California clause is the same as federal clause).

28

1    **a.    Defendants Have Advanced, Under A "Takings"**

2    **Label, A Thinly-Disguised Due Process Argument**

3    Defendants' Takings Clause challenge to the Act's requirement that certain

4    artwork sellers pay a royalty to the artist is, in reality, the due process argument the

5    Ninth Circuit already rejected in *Morseburg*.

6    As the Takings Clause, by its express terms, covers takings of private

7    property by the government for a public purpose, and since the money at issue here

8    is owed to private individuals (artists), defendants' arguments are beyond the scope

9    of the Takings Clause. *See* U.S. Const., Amend. V ("[N]or shall private property be

10   taken for public use, without just compensation."); *Williamson County Regional*

11   *Planning Com'n v. Hamilton Bank*, 473 U.S. 172, 194 (1985) ("The Fifth

12   Amendment does not proscribe the taking of property; it proscribes taking without

13   just compensation."); *Bush v. O'Brien*, No. C 09-0947 RS (PR), 2010 WL 3324959,

14   at *3 (N.D. Cal. Aug. 23, 2010) (sale of impounded vehicle by towing company and

15   subsequent retention of proceeds from sale by towing company did not implicate

16   Takings Clause "as the money received for the sale of the vehicle went to the towing

17   company, not the government."); *see Small Property Owners of San Francisco v.*

18   *City and County of San Francisco*, 141 Cal.App.4th 1388, 1401 n.6 (2006) ("[T]he

19   application of the Takings Clause to regulations mandating only the payment of

20   money leads to odd results. It is far more logical to conclude that a regulation of

21   this sort might be declared invalid as violative of due process, than that the

22   government should give back the money it legitimately took.").[11]

23

24

---

25   [11] *Small Property Owners* ultimately did conduct a Takings Clause analysis

26   because the real issue there was not the payment of money, but the economic impact
     of the ordinance at issue on the plaintiffs' real estate investments. *Small Property*

27   *Owners of San Francisco,* 141 Cal.App.4th at 1402.

28

1    As the Ninth Circuit did in *Vance v. Barrett*, 345 F.3d 1083 (9th Cir. 2003),

2 this Court should properly consider defendants' argument as sounding in due

3 process, not as a takings argument.  In *Vance*, the court held that a plaintiff who

4 argued the government did not have the authority to take his money at all (rather

5 than that the government was required to pay just compensation for taking his

6 money) had raised a due process, rather than takings, claim.  *Id.* at 1090 n.7.  This

7 analysis recognizes the key difference between the Takings Clause and substantive

8 Due Process:  that the Takings Clause prohibits the taking of property without

9 payment of just compensation, while substantive Due Process defines what the

10 government is permitted to take at all.  *Unity Real Estate Co. v. Hudson*, 178 F.3d

11 649, 658-59 (3d Cir. 1999) ("If the government pays just compensation, it may take

12 private property for public use under the Takings Clause.  Due process protections,

13 by contrast, define what the government may not require of a private party at all.").[12]

14    So, too, here.  Defendants' contention is not that the Royalty Act is invalid

15 because it does not provide just compensation for the taking of "property," but

16 instead that the Act is invalid insofar it requires the payment of money by one

17 private individual to another private individual.  (*See* MTD at 18:2-6 ("The [Royalty

18 Act] stands in direct contradiction to this principle:  it confiscates the private

19 property of select individuals and transfers that property to other private individuals

20 for their sole use and benefit, bestowing no discernable benefit on the greater

21 public."); *id.* at 21:22-23 ("[T]he proceeds of a resold artwork are private property

22 protected from confiscation by the Fifth Amendment.").)

---

23 [12]  The Supreme Court, too, discussed this distinction between Due Process and

24 Takings in detail, explaining in *Lingle v. Chevron USA, Inc.*, 544 U.S. 528 (2005)

25 that "the Takings Clause does not prohibit the taking of private property, but instead

places a condition on the exercise of that power.  In other words, it is designed not

26 to limit the governmental interference with property rights *per se*, but rather to

27 secure compensation in the event of otherwise proper interference amounting to a

taking." *Id.* at 536-37 (citations and quotations omitted).

28

1    The Takings Clause simply does not apply in such circumstances.  *See*
2    *McCarthy v. City of Cleveland*, 626 F.3d 280, 285-86 (6th Cir. 2010) (Takings
3    Clause does not apply to law that merely imposes a monetary obligation, rather than
4    taking specific property); *West Virginia CWP Fund v. Stacy*, No. 11-1020, __ F.3d
5    __, 2011 WL 6062116, at *6 (4th Cir. Dec. 7, 2011) ("an obligation to pay money
6    cannot constitute a taking"); *Swisher Int'l, Inc. v. Schafer*, 550 F.3d 1046, 1054
7    (11th Cir. 2008) ("[T]akings analysis is not [appropriate] for the constitutional
8    evaluation of an obligation imposed by Congress merely to pay money.");
9    *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1339 (Fed. Cir. 2001)
10   (en banc) ("Thus five justices . . . in *Eastern Enterprises*[, 524 U.S. 498] agreed that
11   regulatory actions requiring the payment of money are not takings. We agree with
12   the prevailing view that we are obligated to follow the views of that majority.").
13        Because defendants seek to apply a Takings Clause analysis to what is plainly
14   a Due Process challenge, and because the Ninth Circuit has dispositively rejected a
15   due process challenge to the Royalty Act, defendants' "Takings Clause" challenge
16   must be properly recast by this Court as a due process challenge, and denied as such.

        b.    **Even Under A Takings Clause Analysis, The Royalty**
17
18            **Act Readily Passes Muster**
19        Assuming for the sake of argument that Takings Clause jurisprudence could
20   apply – notwithstanding defendants' true complaint about the Royalty Act – the
21   two-step analysis required by the Takings Clause establishes the meritlessness of
22   defendants' challenges.  To determine whether a "taking" has occurred, a court will
23   "first determine whether the subject matter is 'property' within the meaning of the
24   Fifth Amendment, and, second, … establish whether there has been a taking of that
25   property, for which compensation is due." *Engquist v. Oregon Dept. of Agric.*, 478
26   F.3d 985, 1002 (9th Cir. 2007).
27        Defendants cannot prevail under either step.
28

By defendants' own telling, the "property" supposedly "taken" by the Royalty Act is a portion of proceeds earned on certain artwork sales.  MTD at 20:24 ("The proceeds realized from any sale of an artwork are also private property."); *id.* at 21:9-10 ("[T]he owner has a property interest in all proceeds actually produced from the sale."); *id.* at 21:14-15 ("Plaintiffs seek to confiscate trust funds, *i.e.* funds that defendants hold in trust for their principals").[13]  As is discussed above, this contention removes defendants' arguments from a Takings Clause analysis and into a Due Process analysis. *Supra* at 20.  However, even where money does qualify as an identifiable "property" interest, the determination whether the Royalty Act effects a taking must be determined according to the fact-driven analysis applicable to regulatory takings, rather the *per se* analysis applicable to physical appropriations of property.

### (1)   The Royalty Act Is Not A *Per Se* Taking

Defendants erroneously contend that the Royalty Act calls for a *per se* taking – akin to the physical taking of property involved in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), and to the total seizure of an entire,

---

[13]  At some points, defendants hint that the Royalty Act effects a "taking" because it somehow interferes with art owners' interest in the artwork itself or their interest in realizing a profit on the sale of artwork.  Under those arguments, the property interest at issue would be the artwork itself (because the Royalty Act infringes upon an ownership interest in the artwork).  However, the Takings Clause is inapplicable to such arguments.  In order to qualify as a "taking" of the artwork, the Royalty Act would have to deprive owners of all or essentially all of the value of the artwork.  No "taking" occurs "unless there remains no permissible or beneficial use for that property after the regulatory action." *Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1041 (9th Cir. 2000); *Moore v. City of Cost Mesa*, 886 F.2d 260, 263 (9th Cir. 1989) ("A regulation that adversely affects property values does not constitute a taking unless it destroys a major portion of the property's value.").  Since the Royalty Act does not completely deprive art owners of all uses of the artwork or even of the ability to sell the artwork, the artwork itself is not "taken."  Thus, the only "property" that defendants can even argue is "taken" by the Royalty Act is a portion of the proceeds earned on a sale of artwork.

1   identifiable corpus of money in *Brown v. Legal Found. of Wash.*, 538 U.S. 216

2   (2003) – that gives rise to a categorical obligation by the state to pay compensation.

3   (MTD at 18:17-18, 21:24-23:1.)  This is wrong for several reasons:

4          First, because the obligation to pay money to an artist only arises if a

5   California owner of that artist's work <u>chooses</u> to sell the work, nothing akin to a

6   physical taking occurs under the Royalty Act.  As explained in *Horne v. United*

7   *States Dept. of Agric.* No. 10-15270, __ F.3d __, 2011 WL 2988902 (9th Cir. July

8   25, 2011), a *per se* taking can only occur when the government <u>requires</u> a property

9   owner to submit to the taking.  *Id.* at *7 (discussing *Yee v. City of Escondido*, 503

10  U.S. 519 (1992), and *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984)).  Where

11  the obligation to pay money or deliver property to the government arises because of

12  a voluntary act, no *per se* taking occurs.  *Id.* at *7-8; *Yee*, 503 U.S. at 527 (no *per se*

13  taking where restrictions on property use arose only because landowner chose to

14  operate property as mobile home park because "[t]he government effects a physical

15  taking only where it *requires* the landowner to submit to the physical occupation of

16  his land." (emphasis in original)); *F.C.C. v. Florida Power Corp*, 480 U.S. 245, 252

17  (1987) (no *per se* taking where regulation setting rates for rental of utility pole space

18  to cable companies applied only to power company that voluntary rented pole space

19  to cable companies; "[t]his element of required acquiescence is at the heart of the

20  concept of occupation.").  Because, here, it is only the voluntary act of selling a

21  painting that gives rise to the obligation to pay a royalty, whether a taking occurs

22  under the Royalty Act must be determined according to the multifactor inquiry

23  applicable to regulatory takings.  *See id.*

24         Second, the *per se* approach urged by defendants is reserved for physical

25  appropriations of specific, identifiable property, rather than, as in the present case,

26  compelled payments of fungible money.  The Royalty Act is essentially

27  indistinguishable from numerous other state and local regulations that either require

28  the payment of money to private parties or the government, or permit the

1  government to seize or retain money.  For example, *United States v. Sperry Corp.*,

2  493 U.S. 52 (1989), held that, because money is fungible, a requirement that

3  someone pay money is <u>not</u> the same as a physical appropriation of property and,

4  therefore, that the *ad hoc*, rather than *per se*, takings analysis applied.  "It is artificial

5  to view deductions of a percentage of a monetary award as physical appropriations

6  of property.  Unlike real or personal property, money is fungible." *Id.* at 62 n.9.

7      The challenged law in *Sperry*, similar to the Royalty Act, required the

8  deduction by the Federal Reserve of 1½% of any monetary award paid out of a

9  Federal Reserve account that had been established to satisfy private claims against

10  the Iranian government, and the payment of that sum into the federal Treasury.

11  *Sperry*, 493 U.S. at 56-58.  The plaintiff there argued, as do defendants here, that the

12  deduction was akin to a physical occupation of its property and therefore qualified

13  as a "taking." *Id.* at 62 n.9.  Rejecting the argument, the Supreme Court held the

14  law did not constitute a "taking." *Id.*  "If the deduction in this case were a physical

15  occupation requiring just compensation, so would be any fee for services, including

16  a filing fee that must be paid in advance." *Id.* at 62 n.9.  In so holding, the Court

17  clarified that *Loretto* did not apply to compelled payments of money, such as are at

18  issue here. *Id.* (applying the *per se* taking rules to requirements to a compelled

19  payment of money "would be an extravagant extension of *Loretto*").[14]

20      To the extent defendants contend *Sperry* is at odds with *Brown*, the argument

21  is meritless.[15]  The two cases can be, and have been, reconciled.  In *Brown*, the law

22

_____

23  [14]  Significantly, the Supreme Court held that it did not matter for purposes of its Takings Clause analysis whether the government deducted the funds directly from

24  the award or required Sperry to pay it separately. *Sperry*, 493 U.S. at 62 n.9.  Thus,

25  *Sperry* and *Brown* cannot be distinguished based on the source of the funds to be paid or retained.

26

27  [15]  If either *Sperry* or *Brown* can be said to have been implicitly overruled, it is *Brown*.  The holding in *Lingle* that whether a "taking" substantially advanced a

28  (footnote continued)

1   at issue provided that 100% of the interest earned on specific funds deposited in

2   specific attorney trust accounts had to be paid to the state.  As a result, what was

3   "taken" in *Brown* was an entire corpus of specifically-identified funds.  What was

4   "taken" in *Sperry*, by contrast, was not specifically-identifiable funds, but instead a

5   small percentage of an award due to plaintiff.  The Ninth Circuit has undertaken

6   precisely such a narrow construction of *Brown*, limiting it to its fact in *McClung v.*

7   *City of Summer*, 548 F.3d 1219, 1228 (9th Cir. 2008) (distinguishing *Brown* in

8   finding *per se* approach inapplicable to ordinance requiring developer to pay for

9   installation of storm pipes because no specific funds were taken and money is

10  fungible).[16]  This caselaw stems from the principle that regulations that "take" <u>all</u> of

11  some particular property interest are to be treated differently from those that "take"

12  only a <u>portion</u> of a property interest.  *See infra* at 29 (under *ad hoc* analysis, no

13  "taking" occurs where government regulation deprives someone of beneficial use of

14  only a small portion of property).

15      Moreover, *Brown* is fundamentally inapplicable to the present case for a

16  number of reasons:

17      First, unlike the regulation at issue in *Brown*, the Royalty Act does not require

18  any direct payment to any government or governmental agency.  At most, any

19

20  public purpose is a Due Process, rather than Takings Clause issue (*supra* at 20),
    creates substantial doubt regarding the continued vitality (or at least the reach) of
21  *Brown*, which was decided two years before *Lingle*.  In *Brown*, the Supreme Court
22  stated that the Takings Clause imposes two conditions on takings by the
    government: (1) that the taking be for a public use, and (2) that just compensation be
23  paid.  *Id*. at 231-32.  *Lingle*, however, makes clear that whether a taking is done for
24  a public purpose (as opposed to a private purpose) is not a Takings Clause question,
25  but a Due Process issue.  *Lingle,* 544 U.S. at 542-43.

26  [16]  Similarly, the Sixth Circuit held in *McCarthy v. City of Cleveland*, that *Brown*
27  was inapplicable to a law that required only the payment of money, as opposed to
    government seizure of specific property.  *See* 626 F.3d at 284-85.
28

1  "taking" that occurs as a result of the Royalty Act is indirect, since the Act requires

2  that monies be paid to private parties.  *See Ascom Hasler Mailing Sys., Inc. v.*

3  *United States Postal Service*, No. 00-1401 (PLF), __ F.Supp.2d __, 2011 WL

4  4526034, at *24 (D.D.C. Sept. 30, 2011) (*Brown* inapplicable to asserted "taking" of

5  interest income where interest was acquired by postal service indirectly when it

6  required that principal deposits be submitted to it rather than plaintiff).  Indeed, in

7  numerous other cases where money purportedly "taken" by a government regulation

8  was required to be paid to private parties rather than the government, the Supreme

9  Court applied the *ad hoc* approach, rather than the *per se* approach used in *Brown*.

10  *See Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 223-25 (1986)

11  (applying *ad hoc* approach to law requiring employers to pay money into a pension

12  fund for the benefit of their former employees); *Concrete Pipe*, 508 U.S. at 643-44

13  (same); *see also Garneau v. City of Seattle*, 147 F.3d 802, 807-08 (9th Cir. 1998)

14  (applying *ad hoc* analysis to city ordinance that required landlords to pay <u>directly to</u>

15  <u>their tenants</u> 50% of costs incurred by low-income tenants to relocate when a

16  landlord redeveloped its property).

17        Second, unlike the regulation in *Brown*, which provided for payment of

18  specific funds (100% of the interest earned on funds on deposit in particular

19  accounts), the Royalty Act does not require that any specific funds be used to

20  comply with the five percent royalty.  Instead, the Royalty Act requires merely that

21  California sellers of artwork pay an amount – from any source of funds – equal to

22  five percent of the artwork's sale price.  *See* Cal. Civ. Code § 986(a).  Where

23  artwork is sold through an agent (an auction house or a gallery), while the agent is

24  assigned the responsibility to ensure that the payment is made (Cal. Civ. Code

25  § 986(a)(1)), the Act does not require that the money come directly from the

26  proceeds collected on the sale of that artist's work.  *See id.* (requiring only that agent

27

28

-27-

1   "withhold 5 percent of the <u>amount</u> of such sale") (emphasis added).[17]

2       In sum, even assuming the Takings Clause were applicable at all to such a

3   regulation, because "money is fungible," at most, the *ad hoc* analysis applicable to

4   regulatory takings – rather than the *per se* analysis applicable to physical

5   appropriations – must be applied. *Garneau*, 147 F.3d at 807-08. Thus, should the

6   Takings Clause be deemed applicable at all here, whether a "taking" occurs when a

7   California seller of artwork pays a royalty to the artist who created that artwork must

8   be determined according to the *ad hoc*, fact-based multi-factor test applicable to

9   regulatory takings.

10           **(2)**     **<u>Applying The *Ad Hoc* Analysis, No Taking</u>**

11                           **<u>Occurs Under The Act</u>**

12       Applying the *ad hoc* takings analysis, a long line of cases makes clear that the

13   Royalty Act cannot possibly be found to effect a "taking," since the Royalty Act

14   requires payment of only five percent of the sale price of a work of fine art, rather

15   than all or substantially all of the sale price.

16       The *ad hoc* takings analysis assesses whether the government regulation

17   "goes too far," and therefore requires compensation (*Garneau*, 147 F.3d at 807), by

18   assessing three factors: (1) the economic impact of the regulation on the party

19   challenging it; (2) the extent to which the regulation has interfered with distinct

20   investment-backed expectations; and (3) the character of the government action.

21

22   [17]   To the extent there is any ambiguity regarding whether the royalty must merely

23   be in an amount equal to five percent of the sale price regardless of the source of

    funds used, or must come from the specific proceeds from the sale of a specific

24   work of art, and to the extent resolution of that ambiguity is relevant to the

25   constitutionality of the Royalty Act, the ambiguity must be resolved in a manner that

    would make the Act constitutional. *Edward J. DeBartolo Corp. v. Florida Gulf*

26   *Coast Building and Const. Trades Council*, 485 U.S. 568, 575 (1988) ("[E]very

27   reasonable construction must be resorted to, in order to save a statute from

    unconstitutionality.").

28

1  *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124 (1978).  At least two
2  of these factors weighs against the Act being deemed a "taking."

3         The first factor cannot be satisfied, since the Act does not cause interference
4  with property rising to a level deemed "significant."  *Washington Legal Found. v.*
5  *Legal Found. of Wash.*, 271 F.3d 835, 860 (9th Cir. 2001) ("Governmental action
6  through regulation of the use of private property does not cause a taking unless the
7  interference is significant.").  Whether a particular interference is "significant" must
8  be measured against the entire corpus of the property at issue.  *Burns v.*
9  *Pennsylvania Dept. of Correction*, 544 F.3d 279, 285 (3d Cir. 2008) (whether a
10 "taking" has occurred must be measured against the entire bundle of rights present).
11 In this case, that entire corpus consists of <u>all</u> of the proceeds obtained through the
12 sale of a work of fine art, not only the five percent to be paid to the artist.  *See*
13 *Concrete Pipe*, 508 U.S. at 643-44 (rejecting argument that requirement that one
14 private party pay money to another private party constituted a complete taking
15 because takings analysis must consider entire corpus of funds, not only that portion
16 require to be paid).  *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470
17 (1987), demonstrates the point.  There, the Supreme Court held that a Pennsylvania
18 statute that required coal mine owners to leave half of the coal found underneath
19 certain buildings and other structures in place and unmined did not effect a "taking."
20 A principal basis for that holding was the fact that the impact of the law was only to
21 require that two percent of the coal in plaintiffs' mines be left in place while the
22 remaining ninety-eight percent could be mined.  *Id.* at 497-99.  In reaching that
23 conclusion, the Court held that whether a "taking" occurred had to be evaluated by
24 looking to all of the coal in the mines affected by the law, not only the coal that the
25 law required to be left in place.  *Id.* at 495-96.  A law that affected only two percent
26 of the coal did not effect a "taking" within the meaning of the Fifth Amendment.

27         The second factor, too, cannot be satisfied since the Royalty Act does not
28 interfere with "reasonable investment-backed expectations" of California owners of

-29-

works of fine art. *Connolly*, 475 U.S. 211, established there can be no interference with any reasonable investment-backed expectation when the party required by law to make payments knew of the possibility that it would be required to make those payments. 475 U.S. at 226-27 ("Prudent employers then had more than sufficient notice not only that pension plans were currently regulated, but also that withdrawal itself might trigger additional financial obligations."). Similarly, *Concrete Pipe* held that there could be no interference with any reasonable investment-backed expectation where existing statutes already created a possibility that the payment of funds being challenged there would occur. 508 U.S. at 645-46.

So, too, here. The Royalty Act was enacted in 1976, and the artwork sales at issue here occurred afterwards. (*See* Complaint, ¶ 16.) Many sellers required to make payments under the Act surely acquired the artwork after that date. "[T]he critical time for considering investment-backed expectations is the time a property is acquired, not the time the challenged regulation is enacted."). *Meriden Trust and Safe Deposit Co. v. FDIC*, 62 F.3d 449, 454 (2nd Cir. 1995). Sellers required by the Act to pay a royalty to artists have long known that they would be obligated to pay five percent of the sale price on a profitable sale of the artwork to the artist who created the artwork. The Royalty Act therefore cannot be deemed to interfere with any reasonable investment-backed expectations held by those sellers.

Since the Royalty Act only affects a similarly small portion of the proceeds on a sale of fine art, it cannot be said to create a significant interference subject to compensation under the Takings Clause. Five percent is simply too little to qualify as "substantial."[18] Likewise, because the Royalty Act was adopted so long ago, it

---

[18] There is no basis for defendants to contest this fact on a motion to dismiss. At the very most, the economic impact of the Royalty Act is a factual issue not capable of resolution on a motion to dismiss. *Garneau v. City of Seattle*, 147 F.3d 802, 807-08 (9th Cir. 1998) (whether taking occurred could not be resolved because "[t]here is very little in the record in this case from which we may determine the economic (footnote continued)

1   cannot reasonably be argued to negatively affect reasonable investment-based

2   expectations of California owners of works of fine art.  In sum, even if the Takings

3   Clause, rather than Due Process, analysis is applied here, the Royalty Act does not

4   suffer from any Fifth Amendment infirmity.

5         **C.**    **The Royalty Act Is Not Preempted By The 1976 Copyright Act**

6              **1.**    *Morseburg* **Is Controlling**

7       Defendants endeavor to revive – with the hope of achieving different results –

8   the very preemption arguments unsuccessfully advanced both before the Ninth

9   Circuit in *Morseburg*, and before Your Honor in *Baby Moose Drawings, Inc. v*

10   *Valentine*, No. 2:11-CV-00697-JHN-JCGx 2011 WL 1258529 (C.D. Cal. April 1,

11   2011).  Defendants' contentions must fare no better now than they did earlier.

12       No colorable basis exists to accept defendants' contention the Act is

13   preempted by the 1976 Copyright Act ("1976 Act").  Although *Morseburg* rejected

14   a preemption argument with respect to the 1909 Copyright Act ("1909 Act"), "[t]he

15   two statutes . . . are substantively identical." *UMG Recordings, Inc. v. Augusto*, 628

16   F.3d 1175, 1182 n.7 (9th Cir. 2011).

17       Defendants have not, significantly, identified any relevant differences in the

18   two Acts that would support a different result with respect to the 1976 Act than was

19   reached in *Morseburg* with respect to the 1909 Act.  To the contrary:

20        •   Section 1 of the 1909 Act provided copyright owners with the same

21           rights that are granted by Section 106 of the 1976 Act, 17 U.S.C. § 106,

22           namely, the exclusive right to "print, reprint, publish, copy, and vend

23           the copyrighted work." *Morseburg*, 621 F.2d at 975.

24        •   Section 27 of the 1909 Act provided purchasers of copyrighted works

25           with the same rights as Section 109(a) of the 1976 Act, 17 U.S.C. §

26           109(a): "but nothing in this title shall be deemed to forbid, prevent, or

27

impact of the TRAO on plaintiffs' property.").

28

1    restrict the transfer of any copy of a copyrighted work the possession of

2    which has been lawfully obtained." *Morseburg*, 621 F.2d at 975.

3  •    In a holding equally true with respect to the 1976 Act, *Morseburg* held

4       the Royalty Act provided rights not encompassed by the 1909 Act,

5       since the right "to vend" granted by Section 1 of the 1909 Act (which is

6       equivalent to the distribution right set forth in Section 106(3) of the

7       1976 Act, 17 U.S.C. § 106(3)) did not:

8       mean[] a right to transfer the works at all times and at all places

9       free and clear of all claims of others.  It is manifest that such is

10      not its meaning.  It merely means that the artist has 'the exclusive

11      right to transfer the title for a consideration to others.' . . . . The

12      California Act does not impair this right; it merely creates a right

13      in personam against a seller of a 'work of fine art'.

14  *Morseburg,* 621 F.2d at 977.

15  •    In a holding equally true with respect to the 1976 Act, *Morseburg* also

16      held the 1909 Act's first sale provision did not preempt the Royalty

17      Act:

18      Nor can we conclude that section 27 of the 1909 Act by

19      implication precludes the enactment of resale royalty acts by

20      the states. *Technically speaking such acts in no way restrict the*

21      *transfer of art works.*  No lien to secure the royalty is attached

22      to the work itself; nor is the buyer made secondarily liable for

23      the royalty.  The work can be transferred without restriction.

24      The fact that a resale may create a liability to the creator artist

25      or a state instrumentality and, at the same time, constitutes an

26      exercise of a right guaranteed by the Copyright Act does not

27      make the former a legal restraint on the latter.

28  *Morseburg,* 621 F.2d at 977-78 (emphasis added).

-32-

1    As the Ninth Circuit's analysis of the 1909 Act applies with equal force to the

2    1976 Act, defendants' preemption argument should be rejected.

3          **2.**      **Section 301(a) Does Not Preempt The Royalty Act**

4    Equally erroneous is defendants' contention that the Royalty Act is preempted

5    by the 1976 Act's Section 301(a), which – as this Court previously found in *Baby*

6    *Moose* – by its terms applies only to "all legal or equitable rights that are equivalent

7    to any of the exclusive rights within the general scope of copyright as specified by

8    section 106." 17 U.S.C. § 301(a) (emphasis added).[19]  Because defendants' Section

9    301(a) argument is that the Royalty Act is preempted by the first sale doctrine

10   (MTD at 35:10-36:19), and because the first sale doctrine is contained in Section

11   109(a) – *not* Section 106 – defendants' Section 301(a) argument fails.

12   Defendants' Section 301(a) preemption argument fails for the separate reason

13   that the rights granted by the Royalty Act are not equivalent to the rights granted by

14   Section 106 of the Copyright Act.  Section 301(b) explicitly states:

15         Nothing in this title annuls or limits any rights or remedies under the

16         common law or statutes of any State with respect to … (3) activities

17         violating legal or equitable rights that are not equivalent to any of the

18         exclusive rights within the general scope of copyright as specified by

19         section 106.

20   17 U.S.C. § 301(b).

21   "If a state law claim includes an 'extra element' that makes the right asserted

22   qualitatively different from those protected under the Copyright Act, the state law

23   claim is not preempted by the Copyright Act." *Altera*, 424 F.3d at 1089.  As

24   *Morseburg* held, the elements of a Royalty Act claim are entirely different from the

25   rights granted by federal copyright laws.  *Morseburg*, 621 F.2d at 977.

26   ─────────────────

[19]  The rights "specified by Section 106" are those of reproduction, preparation of

27   derivative works, distribution and display. *Altera Corp. v. Clear Logic, Inc.*, 424

F.3d 1079, 1089 (9th Cir. 2005); *Baby Moose*, 2011 WL 1258529, at *3.

28

1    This Court reached the same conclusion in *Baby Moose*: "[t]he Royalty Act's

2    'extra element' in granting a 5% royalty right on resale amounts to artists is

3    qualitatively different from the rights granted to copyright holders under the

4    Copyright Act." *Baby Moose*, 2011 WL 1258529, at *3. *See also, e.g., Durgom v*

5    *Janowiak*, 74 Cal. App.4th 178, 186 (1999) (plaintiff's "state law right to receive

6    royalties pursuant to contract is not equivalent to any of the exclusive rights secured

7    by a federal copyright").

8    Indeed, the elements of a Royalty Act claim are entirely different from the

9    elements of a claim under the 1976 Act, since a Royalty Act claim involves, among

10   other elements: (i) either the seller resides in California or the sale occurred in

11   California, (ii) the sale price was at least $1,000, (iii) the gross sales price was not

12   lower than the seller's purchase price; and (iv) at the time of resale, the artist was a

13   citizen of the United States or a resident of California who had resided in the state

14   for at least two years. *See* Cal. Civ. Code § 986. None of those elements is an

15   element of a claim under the 1976 Act.[20] *See also, e.g., Wojnarowicz v. American*

16   *Family Ass'n*, 745 F. Supp. 130, 135 (S.D.N.Y. 1990) (holding that the 1976 Act

17   does not preempt New York's Artists' Authorship Rights Act, and stating that,

18   "[w]here the state law violation is predicated upon an act incorporating elements

19   ────────────────────────────

     [20] *Laws v. Sony Music Entertainment, Inc.*, 448 F.3d 1134 (9th Cir. 2006), in which

20   the defendant produced a song that contained a sample of a recording plaintiff had
     made, does not support defendants' preemption argument. As an initial matter,

21   *Laws* explicitly stated its holding was limited to the facts before it – which are

22   nowhere remotely similar to Royalty Act issues – and not that California's right of
     privacy and right of publicity laws are preempted generally by the Copyright Act.

23   *Laws*, 448 F.3d at 1139. Thus, although plaintiff's state law claim contained an

24   element (a "commercial purpose") that is not required for a copyright infringement
     claim, the nature of plaintiff's state law claim was identical to a copyright claim, the

25   allegedly unauthorized use of her copyrighted song. In contrast, a claim under the
     Royalty Act has no relationship to a Copyright Act claim, as a violation of the

26   Royalty Act does not constitute a violation of the 1976 Act. Thus, *Laws* is

27   inapposite.

28

1  beyond mere copying, the action is qualitatively different and there is no

2  preemption").

3        For each of these reasons, Section 301(a) does not preempt the Royalty Act.

4        **3.   The First Sale Doctrine Does Not Preempt The Royalty Act**

5        Defendants' "first sale doctrine" preemption argument also fails for a number

6  of reasons.

7        As an initial matter, Section 109(a)'s plain language makes clear that no

8  preemption exists.  Section 109(a) provides that the purchaser of a copy of a

9  copyrighted work may sell or dispose of that copy <u>without the copyright owner's</u>

10 <u>authorization</u>:

11          Notwithstanding the provisions of section 106(3), the owner of a

12          particular copy or phonorecord lawfully made under this title, or any

13          person authorized by such owner, is entitled, <u>without authorization of</u>

14          <u>the copyright owner</u>, to sell or otherwise dispose of the possession of

15          that copy or phonorecord.

16 17 U.S.C. § 109(a) (emphasis added).

17       The Royalty Act – because it does not purport to give the artist the right to

18 prevent the owner of a work of fine art from selling that work – does not conflict

19 with Section 109(a).  Rather, as the Ninth Circuit and this Court held, the Royalty

20 Act only grants the artist the right to a five percent royalty on the amount of the sale.

21 *Morseburg*, 621 F.2d at 877-978; *Baby Moose*, 2011 WL 1258529, at *3.

22       No case cited by defendants supports their position:

23       •   *Bobbs-Merrill Co. v. Isidor Straus*, 210 U.S. 339 (1908), apart from the

24          fact that it was decided before either the 1909 or 1976 Acts, was the

25          source from which the first sale doctrine was codified in the 1909 Act.

26          *See Quality King Distributors, Inc. v. L'Anza Research Int'l, Inc.*, 523

27          U.S. 135, 141-42 (1998).  Hence, given the holding in *Morseburg* that

28          the 1909 Act's first sale provision did not preempt the Royalty Act,

-35-

1   *Bobbs-Merrill* cannot stand as authority for the argument that the

2   Royalty Act is preempted.[21]

3   • *Quality King* similarly offers no support for defendants' preemption

4   argument.  In *Quality King*, the defendant bought the plaintiff's

5   products with copyrighted labels abroad, and resold them in the United

6   States to retailers not authorized to carry them domestically.  The Court

7   held that plaintiff's claims were barred because the first sale doctrine

8   applies to copies that are lawfully acquired abroad, and then imported

9   into the United States.  Defendants cite *Quality King* for the proposition

10   that, "once the copyright owner places a copyrighted item in the stream

11   of commerce by selling it, he has exhausted his exclusive statutory

12   right to control its distribution."  (MTD at 28:19-21, *citing Quality*

13   *King*, 523 U.S. at 152.)  That statement, however, does not support

14   defendants' preemption argument.  As stated above, the Royalty Act

15   does not allow the artist to control subsequent distribution of the

16   _____

17   [21]  *Bobbs-Merrill* is also plainly distinguishable.  There, a book publisher printed a
notice on the cover of copies of a book stating that if the book was sold for less than

18   a dollar, the purchaser would be liable for copyright infringement.  The publisher

19   sued to enjoin a defendant from doing just that, leading to a decision that the notice
was not enforceable against purchasers not in privity of contract with the publisher.

20   "What the complainant contends for embraces not only the right to sell the copies,

21   but to qualify the title of a future purchaser by the reservation of the right to have
the remedies of the statute against an infringer because of the printed notice of its

22   purpose so to do unless the purchaser sells at a price fixed in the notice.  To add to

23   the right of exclusive sale the authority to control all future retail sales, by a notice
that such sales must be made at a fixed sum, would give a right not included in the

24   terms of the statute." 210 U.S. at 351 (emphasis added).  Thus, the plaintiff in

25   *Bobbs-Merrill* sought to use the copyright law to enjoin subsequent sales of copies
of the work.  The Royalty Act does not grant artists any such power.  As the Ninth

26   Circuit and this Court held, the Royalty Act only provides the artist with the right to

27   receive a royalty on sales.  It does not give the artist the authority to prevent such
sales.  *Bobbs-Merrill* is therefore inapposite.

28

-36-

artwork or render the seller or buyer liable for copyright infringement.
Instead, it simply requires that the seller (or its agent) pay the artist the
five percent royalty.

- Isolated statements cited by defendants from a 1992 report by the
Register of Copyrights concerning a potential federal resale royalty act
do not support preemption.  As an initial matter, the report is not an
agency regulation and is therefore only accorded whatever weight is
supported by its own persuasiveness.  *Christensen v. Harris County*,
529 U.S. 576, 587 (2000).  In addition, after merely stating that "[a]ny
state resale royalty scheme <u>may</u> be preempted under Section 301 of the
1976 Act," *id.* at v (emphasis added), the report states "[t]he question of
federal preemption and the California law is not a settled one."
(Russell Decl. Ex. 27 at 77.)  Equally baseless is the report's
subsequent speculation that any state *droit de suite* law would be
preempted by the Copyright Act, *id.* at 86, since neither of the two
cases cited for that proposition – *Robert H. Jacobs, Inc. v. Westoaks
Realtors, Inc.*, 159 Cal.App.3d 637 (1984), and *Associated Film
Distributed Corp. v. Thornburgh*, 520 F.Supp. 971 (E.D. Pa. 1981) –
remotely supports such a conclusion.  Among other things, *Jacobs* did
not involve the issue of preemption, and *Associated Film* was
reversed.[22]  Thus, the report's statements are of no support to
defendants.[23]

---

[22]   The only issue in *Jacobs* was whether architectural plans are encompassed by the
Royalty Act.  The court held they were not.  Preemption was not an issue.  The
court merely referred in dicta to Nimmer for the argument that the Royalty Act was
preempted by the 1976 Act, and did not express an opinion on that subject, much les
rule on it.  *Jacobs* therefore did not fule on the the issue of preemption.  159 Cal.
App.3d at 644.  (For the same reasons, defendants' reliance on *Jacobs* (*see* MTD at
(footnote continued)

1    Equally unavailing as defendants' attempt to support their preemption

2 argument with caselaw, is defendants' effort to denigrate that case law which

3 undermines their position.  In asserting to this Court that *Morseburg* is not

4 "persuasive" due to subsequent Supreme Court precedent (MTD at 32:37-33:11),

5 defendants cite but a single post-*Morseburg* case – *Quality King, supra*.  As

6 demonstrated above, however, *Quality King* by no means supports defendants, since

7 the Supreme Court there did not suggest the 1976 Act's first sale provision should

8 be interpreted any differently than the 1909 Act's first sale provision.  *Quality King*

9 therefore offers no support whatever for defendants' effort to undermine the

10 precedential value of *Morseburg*.

11    It is also noteworthy that repeated congressional action confirms Congress did

12 not intend to "occupy the field" of resale royalties.  Bills requiring resale royalties

13 were proposed in 1978, 1986 and 1987.  *See* H.R. 5722, 95th Cong., 2nd Sess.

14 (1978); H.R. 5722, 99th Cong. 2nd Sess. (1986); S. 2796, 99th Cong., 2nd Sess.

15 (1986); H.R. 2331, 100th Cong., 2nd Sess. (1987), S. 1619, 100th Cong., 2nd Sess.

16 (1986).  In no such instance did Congress enact a resale royalty.[24]  Thus, the 1976

17

18 31:15-20) lacks merit.)

Nor does *Associated Film* support a finding of preemption because, among other

19 things, it was reversed.  *Associated Film Distribution Corp. v. Thornburgh*, 683

20 F.2d 808 (3d Cir. 1982).  In doing so, the Third Circuit held that a state law

21 prohibiting movie distributors' practice of requiring movie theater owners to bid for

the right to exhibit motion pictures without having seen the film first was <u>not</u>

22 preempted by the 1976 Act.  *Associated Film* therefore stands in support of the

23 proposition that the Royalty Act is not preempted.

24 [23]  Patry's copyright treatise describes the Register's report as "unduly negative and

25 judgmental."  William F. Patry, *Patry on Copyright*, §13:2, n.7 (2011).

26 [24]  Similarly, the Visual Artists Rights Act of 1990, while initially providing for a

27 resale royalty, dropped that provision "due to opposition from art dealers, gallery

owners, auction houses, and others . . . ."  Michael B. Reddy, "The Droit de Suite:

28 (footnote continued)

-38-

1   Act – like the 1909 Act – neither provides for a resale royalty nor expresses

2   "hostility toward such a royalty . . . ." *See Morseburg*, 621 F.2d at 978.  As with the

3   1909 Act, these facts do not demonstrate Congress' intent in the 1976 Act to

4   preempt the Royalty Act.

5        Finally, defendants' contention that the federal copyright act preempts state

6   laws that impact the distribution of copyrighted works is erroneous, since such laws

7   are regularly upheld. *See, e.g., Watson v. Buck*, 313 U.S. 387 (1941) (state statute

8   prohibiting price fixing among owners of music copyrights not preempted by federal

9   copyright laws); *Fox Film Corp. v. Doyal*, 286 U.S. 123 (1932) (state tax on gross

10  receipts of royalties from exploitation of copyrighted work enforceable); *Associated*

11  *Film Distribution Corp.*, 683 F.2d 808 (upholding state law prohibiting movie

12  distributors' practice of requiring movie theater owners to bid for the right to exhibit

13  motion pictures without having seen the film first).

14       As this Court expressly noted in *Baby Moose*, Congress clearly indicated the

15  1976 Act does not preempt the Royalty Act.  In connection with the enactment of

16  the Visual Artists Rights Act of 1990, the Committee on the Judiciary stated with

17  respect to the issue of preemption:

18       State artists' rights laws that grant rights not equivalent to those

19

20  Why American Fine Artists Should Have the Right to a Resale Royalty," 15 Loyola
    of Los Angeles Entertainment Law J. 509, 525 (1995).  In its place, Congress
21  merely ordered the Copyright Office to study the feasibility of enacting a resale
22  royalty law. *Id.* The Copyright Office, upon studying the situation, was "not
    persuaded that a sufficient economic and copyright policy justification exist[s] to
23  establish the *droit de suite* in the United States."  United States Copyright Office,
24  *Droit de Suite:  The Artist's Resale Royalty* (1992) at 149, quoted in Reddy, *supra*,
    15 Loyola of Los Angeles Entertainment Law J. at 526.  "While the Report
25  ultimately opposed the immediate enactment of a federal resale royalty, it hedged its
26  conclusion by saying that '[C]ongress may want to take another look' if the
    European Community decided to harmonize its droit de suite legislation and
27  extended it to all of its member States." *Id.* at 526.

28

1    accorded under the proposed law are not preempted, even when they

2    relate to works covered by [the Copyright Act].  For example, the law

3    will not preempt a cause of action for a misattribution of a reproduction

4    of a work of visual art <u>or for a violation of a right to a resale royalty</u>.

5    *Baby Moose*, 2011 WL 1258529, at *3 (emphasis added), *citing* H.R. Rep. No. 514,

6    101st Cong., 2d Sess. (1990), at p.23.

7        For each of the foregoing reasons, defendants have failed to offer any

8    persuasive reason why this Court should, in contravention of *Morseburg* and *Baby*

9    *Moose*, find the Royalty Act preempted by the Copyright Act.[25]

10       **D.**    **Plaintiffs' Prayer For Punitive Damages Is Proper**

11       Defendants' request to dismiss plaintiffs' prayer for punitive damages also

12   should be denied.  California Civil Code section 3294 provides:

13       In an action for the breach of an obligation not arising from contract,

14       where it is proven by clear and convincing evidence that the defendant

15       has been guilty of oppression, fraud or malice, the plaintiff, in addition

16       to the actual damages, may recover damages for the sake of example

17       and by way of punishing the defendant.

18   Cal. Civil Code § 3294(a).  Plaintiffs' Royalty Act claim is for an obligation that

19   does not arise from contract, and therefore falls squarely within Section 3294.  Thus,

20   the Royalty Act did not need to include an express provision for punitive damages,

21   as Section 3294 already provided for them.

22

23

24   [25]  Defendants' assertion that Patry's treatise on copyright supports a finding of
preemption is patently incorrect.  Patry expressly acknowledges that the Royalty Act

25   is *not* preempted: "California provides for an artist's resale royalty, what in Europe
is called *droit de suite*.  Since there is no such provision in the federal law and the

26   grant of such a right does not interfere with any rights under title 17 – the resale

27   applies to the physical object only – such laws are not preempted."  Patry, § 8:43.60.

28

California's Supreme Court held in *Commodore Home Systems, Inc. v. Superior Court*, 32 Cal.3d 211 (1982), that "[w]hen a statute recognizes a cause of action for violation of a right, all forms of relief granted to civil litigants generally, including appropriate punitive damages, are available unless a contrary legislative intent appears." *Id.* at 215.  The Court held in *Commodore* that punitive damages are available for claims under California's Fair Employment and Housing Act, even though they are not expressly provided by that Act.

Defendants contend that a 1982 amendment to the Royalty Act providing for the recovery of attorneys' fees demonstrates that punitive damages are not recoverable under the Act.  (MTD at 41-42.)  Defendants are wrong.  The Court rejected that same argument in *Commodore*, holding that FEHA's provision for attorney's fees did not demonstrate an intent to preclude punitive damages.[26] *Commodore*, 32 Cal.3d at 216.

Defendants' motion to dismiss should also be denied for the reason that punitive damages are available for statutory violations where the expressly-provided remedies are inadequate.  *See, e.g., De Anza Santa Cruz Mobile Estates Homeowners Ass'n v. De Anza Santa Cruz Mobiles Estates*, 94 Cal.App.4th 890, 912 (2001); *Turnbull & Turnbull v. Ara Transportion, Inc.*, 219 Cal.App.3d 811, 826-27 (1990).  Plaintiffs submit the evidence will demonstrate that the remedies specifically set forth in the Royalty Act are inadequate, and that punitive damages are necessary to further the Act's purposes.  *See, e.g., Orloff v. Los Angeles Turf Club*, 30 Cal.2d 110 (1047) (injunctive relief available because statutory remedy of damages and a penalty were inadequate); *Greenberg v. Western Turf Ass'n*, 140 Cal. 357 (1903) (punitive damages permissible even though statute provided for actual

---

[26]  Exhibits 11, 12 and 13 to the Russell Declaration are inadmissible (and irrelevant) for the reasons set forth in plaintiffs' opposition to defendants' request for judicial notice.

damages and a penalty, as penalty was not based on nature of defendant's misconduct).

Unlike cases in which the remedies provided by the statutes at issue were found to bar punitive damages, the Royalty Act does not provide for treble damages, *Turnbull*, 219 Cal.App.3d at 827, or a penalty in addition to actual damages. *De Anza*, 96 Cal.App.4th at 906.  Instead, the Royalty Act only provides for a five percent royalty and attorney's fees.

Plaintiffs believe the evidence will demonstrate that those remedies are inadequate to fully effectuate the Act's purposes given, among other things, that defendants have known about the Act since its inception (having attempted to block its enactment) and since that time have willfully elected to violate it.  If defendants truly believed the Act was unconstitutional, the proper course would have been to comply with it and then challenge it in court, rather than ignore the Act's requirements for more than thirty years, hoping no artist would have the temerity to challenge them.  Punitive damages are therefore necessary to fully effectuate compliance with the Act.[27]

Finally, contrary to defendants' assertion, the inclusion of a punitive damages provision in the California Art Preservation Act ("CAPA"), Cal. Civ. Code § 987, does not support the conclusion that punitive damages are unavailable under the Royalty Act.  CAPA's punitive damages provision expressly provides that any punitive damages should be awarded, not to the plaintiff, but rather to a charitable or educational organization selected by the court. *Id.* at § 987(e)(3).  The legislature therefore had to include a specific punitive damages provision in CAPA to achieve that result, since the general statutory punitive damages provision, Cal. Civ. Code

---

[27]  In addition, plaintiffs believe the evidence may demonstrate that defendants conspired to ignore the Royalty Act.

§ 3294, provides that the plaintiff receives the punitive damages. CAPA's punitive damages provision therefore does not support defendants' argument. Moreover, defendants fail to identify anything in the legislative history of either the Royalty Act or CAPA indicating that the punitive damages provision in CAPA is relevant to the availability of punitive damages under the Royalty Act.

### E.     The Estate Of Robert Graham Is A Proper Plaintiff

Defendants' contention that plaintiff Estate of Robert Graham is an improper plaintiff ignores the explicit allegations of the complaint and controlling law.

The Royalty Act specifically provides that, when an artist with claims under the Act dies, those claims pass to his or her heirs, legatees or personal representatives. Cal. Civ. Code § 986(a)(7) ("Upon the death of an artist, the rights and duties created under this section shall inure to his or her heirs, legatees, or personal representative").[28] Thus, a deceased artist's successor in interest has standing to bring claims that could have been brought by the artist if he or she were still living.

The Estate of Robert Graham is "the heir, legatee and/or personal representative of artist Robert Graham." (Complaint ¶ 2.) Because that allegation must be accepted as true, *Syverson*, 472 F.3d at 1075, it necessarily follows that the Estate of Robert Graham has standing to sue under the Royalty Act and is a proper plaintiff.

Moreover, defendants are simply wrong when they argue that a decedent's estate is not a legal entity capable of participating in a lawsuit. There are even

---

[28]  This provision is not unique in providing standing to sue to persons other than the administrator or executor of a decedent's estate. California Code of Civil Procedure section 377.30 provides: "A cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest … and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest."

1  California statutes that <u>require</u> that an estate be named as a party in certain types of

2  legal actions.  *E.g.*, Cal. Prob. Code § 552(a) ("An action under this chapter shall

3  name as the defendant, 'Estate of (name of decedent), Deceased.'").  Although that

4  statute does not apply here, it does reflect that blanket arguments that estates have

5  no legal standing are incorrect.

6        In this case, Estate of Robert Graham is the heir, legatee and/or personal

7  representative of Robert Graham and, as such, it is a proper party to this suit.  The

8  motion to dismiss Estate of Robert Graham must be denied.[29]

9      **F.**     <u>**Plaintiffs Have Sufficiently Pleaded Their Claims**</u>

10        Defendants incorrectly object that plaintiffs have not sufficiently pleaded their

11  claims.

12        Plaintiffs allege defendants have sold artworks for which they are required by

13  the Royalty Act to pay royalties, but failed and refused to pay plaintiffs the royalties

14  due.  (Complaint, ¶¶ 9-11.)  Plaintiffs allege defendants'

15      custom and practice is to conceal the fact of a seller's California

16      residency, or the fact that a sale took place in California, from

17      communications with the public concerning auctions and sales of Fine

18      Art.  By way of several examples [defendants'] auction catalogs

19      generally conceal from the reader the state of residency of a seller of

20      Fine Arts, and [defendants] will refuse – upon inquiry – to reveal said

21      information.  None of these practices is necessary to maintain the

22      anonymity of a seller of Fine Art, since [defendants] could – but

23      refuse[] to – identify the state of residency (and not the identity) of a

24      Fine Art seller, or could otherwise denote by the inclusion of a symbol

25

26  [29]  In the event the Court determines otherwise, plaintiffs request leave to amend to

27  name the individual the Court determines would have standing to pursue these
   claims.

28

1    in [their] catalog materials (as [defendants do] for other circumstances)

2    that the lot is one for which the artist will be entitled to the Royalty due

3    under California law.  Similarly, [defendants] conceal[] information

4    from the public that would enable a reader to learn whether a non-

5    auction sale of Fine Art took place in California.

6 (Complaint, ¶ 12.)  Defendants have "stymied and prevented plaintiffs and the class

7 members from reasonably discovering the occurrence of auctions and sales for

8 which a Royalty was due" since only defendants "possess[] the knowledge to

9 determine which auctions and sales of Fine Art are ones for which a Royalty is due."

10 (*Id.*, ¶ 13.)  Plaintiffs allege on information and belief that they are owed royalties

11 from defendants, although they are not certain of the amounts owed.  (*Id.*)

12       These allegations, which must all be taken as true, sufficiently plead claims

13 for violation of the Royalty Act and for unfair competition.

14       Defendants assert that the complaints are insufficient because plaintiffs have

15 not identified any specific sales for which they are owed royalties.  Their argument

16 is no different from the one raised unsuccessfully in *Gitterman v. Vitoulis*, 564

17 F.Supp. 46 (S.D.N.Y. 1982).  There, the plaintiffs alleged a violation of the

18 Racketeer Influenced and Corrupt Organizations Act ("RICO").  While they did not

19 allege specific predicate acts for a RICO violation, they did allege on information

20 and belief that "[t]he precise nature of the interstate or foreign commence activities

21 engaged in by the defendants . . . is, at this time, exclusively within the knowledge

22 of the defendants. . . .  Plaintiffs require discovery from the defendants to obtain

23 proof of the precise nature of the interstate or foreign commerce activities engaged

24 in by the defendants."  *Id.* at 49 (quoting from complaint).  The court refused to

25 dismiss the complaint, holding that "[d]ismissal of a complaint before discovery is a

26 drastic step which should not be taken unless it appears to a certainty that the

27 plaintiff is entitled to no relief under any set of facts."  *Id.*  The court added:

28 "pleading on information and belief is permissible where, as here, the facts are

-45-

1 │ peculiarly within the knowledge of the defendants." *Id.* at 50; *Arista Records LLC*

2 │ *v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (holding that *Bell Atlantic Corp. v.*

3 │ *Twombly*, 550 U.S. 5444 (2007) "does not prevent a plaintiff from 'pleading facts

4 │ alleged "upon information and belief'" where the facts are peculiarly within the

5 │ possession and control of the defendant").

6 │      Here, as alleged, the facts of specific sales for which plaintiffs are owed

7 │ royalties are peculiarly within defendants' control. (Complaint, ¶¶ 12-13.)  Given

8 │ discovery, plaintiffs will be able to prove the royalties they are owed and when the

9 │ sales occurred.  Just as dismissal was improper in *Gitterman* because it was possible

10 │ that the plaintiffs could, with discovery, learn the acts predicate to a RICO claim,

11 │ dismissal here would be improper without allowing plaintiffs, through discovery, to

12 │ learn of the sales for which defendants have denied them royalties.

13 │      Indeed, defendants' theory would use the law to perpetuate a game of cat and

14 │ mouse.  So long as discovery is denied, plaintiffs may never be able to learn the

15 │ extent of defendants' disregard of their rights.  And defendants seek to use the Court

16 │ to deny plaintiffs that very discovery.  Plaintiffs allege on information and belief

17 │ that defendants have violated their rights under the Royalty Act.  That should be

18 │ sufficient to permit discovery to proceed.

19 │      Defendants also assert that plaintiffs have not alleged facts entitling them to

20 │ recover royalties for sales within one year of discovery but more than three years

21 │ after the sale, Cal. Civ. Code § 986(a)(3), because plaintiffs have not proven the

22 │ elements of fraudulent concealment.  This argument fails because plaintiffs have not

23 │ alleged <u>fraud</u>, but merely that defendants "affirmatively engaged in a pattern of

24 │ conduct intended to conceal" their violations from plaintiff. (Complaint, ¶ 12.)

25 │ Further, based on the pleading, it cannot be stated that one year has elapsed between

26 │ discovery of any specific violations of the Royalty Act and the filing of this action.

27 │ Indeed, under defendants' theory, plaintiffs cannot recover for any violations they

28 │ are unaware of because they have not alleged those violations.  This is not the law:

1  a cause of action accrues when a plaintiff is injured, not when the injury is

2  discovered. *See, e.g., Menefee v. Ostawari*, 228 Cal.App.3d 239, 245 (1991).  While

3  plaintiffs may benefit from the Royalty Act's tolling of the limitations period,

4  nothing in the Act denies them the right to recover for wrongs that they did not

5  know about prior to discovery.

6  　　　　Moreover, tolling of the statute of limitations is proper even under

7  defendants' fraudulent concealment theory.  Defendants effectively concede that if

8  they owe plaintiffs a fiduciary duty, nondisclosure constitutes fraudulent

9  concealment, and therefore entitles plaintiffs to the benefit of delayed discovery.

10 (MTD at 48:15-17.)  Contrary to defendants' assertion (*see* MTD at 49 n.28), they

11 owe plaintiffs a duty of disclosure of the royalties owed because they are holding

12 royalties as trustee for plaintiffs.  The Royalty Act requires a seller to withhold the

13 royalty, locate the artist and pay the artist.  Cal. Civ. Code § 986(a)(1).  "One who

14 wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the

15 owner."  Cal. Civ. Code § 2223.  Where a person acquires property belonging to

16 another, "the law implies an obligation on the part of the one in whom title has

17 vested to hold the property for the benefit of the owner, and, eventually, to convey

18 to the owner."  *Bainbridge v. Stoner*, 16 Cal.2d 423, 428 (1940).  As the trustee of

19 plaintiffs' royalties, defendants owe plaintiffs a fiduciary duty to undertake to locate

20 plaintiffs and pay the royalties to them.  Because defendants have repudiated their

21 fiduciary duty, plaintiffs are entitled to bring these actions now regardless of what

22 specific acts of concealment they may be aware of.

23 　　　　In sum, plaintiffs have sufficiently pleaded their claims, and are entitled to

24 discovery to substantiate the portions of their claims pleaded on information and

25

26

27

28

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

1  belief.  Defendants, as plaintiffs' trustees, should not be permitted to hide their

2  wrongdoing behind a veil of secrecy of their own creation.[30]

3  **III.    CONCLUSION**

4        For the foregoing reasons, plaintiffs respectfully submit the Court should

5  deny defendants' motion to dismiss in its entirety.

6

7  DATED:  February 6, 2012          BROWNE GEORGE ROSS LLP
                                     Eric M. George
8                                    Michael A. Bowse
                                     Ira Bibbero
9                                    Peter Shimamoto

10

11                                   By    /s/ Eric M. George
12                                          Eric M. George

13                                   Attorneys for Plaintiffs Estate of Robert
                                     Graham; Chuck Close, Laddie John Dill, and
14                                   All Others Similarly Situated

15

16

17

18

19

---

20  [30]  Were the Court to find that plaintiffs' claims are not adequately pleaded,

21  plaintiffs should be given leave to amend their complaints.  "Denial of leave to
    amend is 'improper unless it is clear that the complaint could not be saved by any

22  amendment.'"  *Ross v. O'Neal*, No. 2:11-cv-06124-JHN-Ex, 2011 WL 5041967, *4

23  n.3 (C.D. Cal. Oct. 17, 2011) (quoting *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005)).  Indeed, leave to amend was granted in the

24  authorities relied upon by defendants.  *See Bautista v. Los Angeles County*, 216 F.3d

25  837, 841-42 (9th Cir. 2000) (reversing order dismissing with prejudice); *Mendoza v. Citimortgage, Inc.*, No. 10-CV-03550-LHK, 2011 WL 940336, *4-*6 (N.D. Cal.

26  Feb. 18, 2011) (dismissing all but one cause of action with leave to amend); *Yumul v*

27  *Smart Balance, Inc.*, 733 F.Supp.2d 1117, 1133-34 (C.D. Cal. 2010) (dismissing with leave to amend).

28

-48-

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 2121 Avenue of the Stars, Suite 2400, Los Angeles, CA 90067.

On February 6, 2012, I served true copies of the following document(s) described as **PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS** on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

**BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on February 6, 2012, at Los Angeles, California.


/s/ Kathy Hall
Kathy Hall

## SERVICE LIST

### *Estate of Robert Graham, et al. v. Sotheby's, Inc.*
### U.S. District Court, Case No. CV11-8604 JHN (FFM)

Paul T. Friedman
Deanne E. Maynard
Philip T. Besirof
**MORRISON & FOERSTER LLP**
425 Market Street
San Francisco, CA  94105-2482
Tel: 415.268.7000
Fax:  415.268.7522
PFriedman@mofo.com
DMaynard@mofo.com
PBesirof@mofo.com

Steven A. Reiss *(Pro Hac Vice)*
Howard B. Comet *(Pro Hac Vice)*
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Tel: 212.310.8000
Fax:  212.310.8007
steven.reiss@weil.com
howard.comet@weil.com