1                                                                      JS-6

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11   ESTATE OF ROBERT GRAHAM et al,      CASE NOS.

12          Plaintiffs,                   2:11-cv-08604-JHN-FFM (Sotheby's)

13          vs.                           2:11-cv-08605-JHN-FFM (Christie's)

14   SOTHEBY'S INC.,

15          Defendant;                   **ORDER GRANTING JOINT**

16                                       **MOTION TO DISMISS**

17   SAM FRANCIS FOUNDATION et al,

18          Plaintiffs,                   Judge: Hon. Jacqueline H. Nguyen

19          vs.

20   CHRISTIE'S, INC.,

21          Defendant;

22

23

24        This matter comes before the Court on Defendants Sotheby's, Inc.

25
     ("Sotheby's") and Christie's, Inc.'s ("Christie's") (collectively, "Defendants") Joint
26

27

28

                                         1

Motion to Dismiss ("Jt. Mot."). (2:11-cv-8604-JHN-FFM, docket no. 17.)[1] The Court has read and considered the briefs filed by the parties in this matter. The Court has also considered the oral argument that took place on March 12, 2012.

For the reasons herein, the Joint Motion is **GRANTED** with prejudice.

## I.

## BACKGROUND

Defendants are world-renowned auction houses. Sotheby's is a New York corporation, with its principal place of business in New York. (Sotheby's Compl. ¶ 5; Jt. Mot. 10.) Christie's is also a New York corporation, with its principal place of business in New York. (Christie's Compl. ¶ 6; Jt. Mot. 10.)

On October 18, 2011, Plaintiffs—a collection of artists and their heirs— brought the instant Class Action Complaints (the "Complaints"), alleging that Defendants failed to comply with the California Resale Royalties Act ("CRRA"), Cal. Civ. Code § 986. Specifically, Plaintiffs allege, *inter alia*, that Defendants— acting as the agents for California sellers—sold works of fine art at auction but failed to pay the appropriate resale royalty provided for under the CRRA. (Sotheby's Compl. ¶¶ 9–12.)

_____

[1] All citations to the docket in this opinion are to the 2:11-cv-8604-JHN-FFM docket, unless otherwise stated.

On January 12, 2012, Defendants filed a Joint Motion to Dismiss the Complaints, arguing that the Court should strike down the CRRA because it (1) violates the Commerce Clause of the United States Constitution; (2) effects a taking of private property in violation of the United States and California constitutions; and (3) is preempted by the Copyright Act of 1976.  (Jt. Mot. 7, 17, 24.)  Because the Court finds that the CRRA "cannot withstand Commerce Clause scrutiny," *Nat'l Collegiate Athletic Ass'n v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993), it need not address Defendants' preemption and Takings Clause arguments.

## II.

## LEGAL STANDARD

A defendant may seek dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In evaluating a motion to dismiss, the Court generally cannot consider material outside the complaint, such as facts presented in briefs, affidavits, or discovery materials, unless such material is alleged in the complaint or judicially noticed.  *McCalip v. De Legarret*, No. 08-2250, 2008, U.S. Dist. LEXIS 87870, at \*4 (C.D. Cal. Aug. 18, 2008); *see also Jacobson v. AEG Capital Corp.*, 50 F.3d 1493, 1496 (9th Cir. 1995).  The Court must accept as true all material factual allegations in the complaint and construe them in the light most favorable to the plaintiff.  *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1229 (9th Cir. 2004).  However, this

3

tenet is inapplicable to legal conclusions. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). The Court need not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* The Court, based on judicial experience and common sense, must determine whether a complaint plausibly states a claim for relief. *Id.* at 1950.

### III.

### DISCUSSION

Defendants argue that by purporting to regulate transactions that take place wholly outside of California, the CRRA violates the Commerce Clause of the United States Constitution. (Jt. Mot. 7); U.S. Const. art. I, § 8, cl. 3. The Court conducts its analysis mindful of the "time-honored presumption" that "[e]very legislative act is to be presumed to be a constitutional exercise of legislative power until the contrary is clearly established." *Reno v. Condon*, 528 U.S. 141, 148 (2000); *Close v. Glenwood Cemetery*, 107 U.S. 466, 475 (1883).

### A.    The CRRA

The CRRA provides for a *droit de suite*, or resale royalty right, for fine artists. Cal. Civ. Code § 986. The *droit de suite* creates a "continuing remunerative relationship between a visual artist and his creation," by providing the artist with a right to a royalty payment—consisting of a percentage of an original work's resale price—each time the "original, tangible embodiment" of the artist's work is resold.

Elliot Alderman, *Resale Royalties in the United States for Fine Visual Artists: An Alien Concept*, 40 J. Copyright Soc'y U.S.A. 265, 267 (1992); 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 8C.04[A][1] (2011) [hereinafter "Nimmer"].[2]

The CRRA provides that "[w]henever a work of fine art is sold and the seller resides in California or the sale takes place in California, the seller or the seller's agent shall pay to the artist of such work of fine art or to such artist's agent 5 percent of the amount of such sale." Cal. Civ. Code § 986(a). An artist can waive the right to this royalty "only by a contract in writing providing for an amount in excess of 5 percent of the amount of such sale." *Id.* The CRRA excludes any resale where the gross sales price is less than $1,000. *Id.* § 986(b)(2).

The CRRA defines a work of "[f]ine art" as "an original painting, sculpture, or drawing, or an original work of art in glass." *Id.* § 986(c)(2). An "[a]rtist" is defined as "the person who creates a work of fine art and who, at the time of resale, is a citizen of the United States, or a resident of the state who has resided in the state for a minimum of two years." *Id.* § 986(c)(1). Therefore, the CRRA applies to all artists who are U.S. citizens, regardless of the state in which they reside. Here, for

_____

[2] The *droit de suite* is best understood as an "attempt to equalize the copyright status of fine artists" with that of authors and composers. Nimmer, § 8C.04[A][1]. For while authors and composers are compensated each time their works are performed or reproduced, visual artists "create one-of-a-kind objects, which cannot be copied," and thus receive their income from a work

(footnote continued)

example, Plaintiff Chuck Close resides in New York. (Sotheby's Compl. ¶ 3; Christie's Compl. ¶ 4.)

The CRRA additionally requires the seller's *agent* to effect payment of the resale royalty. Cal. Civ. Code § 986(a)(1). Specifically, the CRRA provides that "[w]hen a work of fine art is sold at an auction or by a gallery, dealer, broker, museum or other person acting as the agent for the seller the agent shall withhold 5 percent of the amount of the sale, locate the artist and pay the artist." *Id.*

If the agent is unable to locate the artist within 90 days, the agent must pay the applicable royalty to the California Arts Council, which is then required to search for the artist for seven years. After that time, if the artist is not located, the funds pass to the California Arts Council for "use in acquiring fine art." *Id.* §§ 986(a)(3), (a)(5). If the seller or the seller's agent fails to pay the appropriate royalty, "the artist may bring an action for damages within three years after the date of sale or one year after the discovery of the sale, whichever is longer." *Id.* § 986(a)(3). The heirs of a deceased artist may assert the artist's rights under the CRRA for 20 years after the artist's death. *Id.* § 986(a)(7). The CRRA excludes any resale for "a gross sales price of less than one thousand dollars ($1000)" or "a

---

almost solely from its initial sale. Michael B. Reddy, *The Droit de Suite: Why American Fine Artists Should Have a Right to a Resale Royalty*, 15 Loy. L.A. Ent. L. Rev. 509, 517 (1995).

gross sales price less than the purchase price paid by the seller." *Id.* § 986(b)(2), (b)(4).

Although such legislation is common among European nations, including France, Germany and the United Kingdom, California's passage of the CRRA in 1976 represented the first *droit de suite* legislation in the United States. *See, e.g.*, William Bates, *Royalties for Artists: California Becomes The Testing Ground*, N.Y. Times, August 14, 1977; Alderman at 268–69; Nimmer, § 8C.04[A][1]; The Artist's Resale Right Regulations 2006, 2006 No. 346, available at http://www.legislation.gov.uk/ uksi/2006/346/contents/made (last viewed, May 16, 2012); *see also* Judicial Improvements Act of 1990, Pub. L. No. 101-650, §608(b), 104 Stat. 5089 (1990).

Notably, several attempts by Congress to introduce resale royalty legislation have failed. Reddy at 511; *see also* U.S. Copyright Office, *Droit de Suite*: The Artist's Resale Royalty (1992) [hereinafter "Report"]. In December 1992, the Copyright Office issued a report concluding that it was "not persuaded that sufficient economic and copyright policy justification exists to establish droit de suite in the United States." Report at 149; *see also* Nimmer at § 8C–13. Other states, including New York, have considered similar legislation, but have not

adopted any measure creating a resale royalty right for visual artists.  (*See, e.g.*, Russell Decl., Ex. 23, at 693–716.)[3]

## B.     The Commerce Clause

The Commerce Clause of the United States Constitution states: "The Congress shall have Power . . . To regulate Commerce . . . among the several States . . . ."  U.S. Const. art. I, § 8, cl. 3.  "Although the Commerce Clause is phrased as an affirmative grant of regulatory power to Congress, the Supreme Court . . . has long interpreted the Clause to have a 'negative aspect,' referred to as the dormant Commerce Clause . . . ."  *Conservation Force, Inc. v. Manning*, 301 F.3d 985, 991 (9th Cir. 2002).  The Supreme Court's dormant Commerce Clause jurisprudence holds that States do not have the "power [to] unjustifiably . . . discriminate against or burden the interstate flow of articles of commerce."  *Id.* (quoting *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994)).  The dormant Commerce Clause is thus a "limitation upon the power of the States."  *Edgar v. MITE Corp.*, 457 U.S. 624, 640 (1982) (quoting *Great Atl. & Pac. Tea Co., Inc. v. Cottrell*, 424

---

[3] According to commentators and news reports, enforcement of the CRRA has been spotty. The *New York Times* recently reported that, since the CRRA was passed in 1977, approximately 400 artists have received a total of $328,000 in resale royalties.  Patricia Cohen, *Artists File Lawsuits, Seeking Royalties*, N. Y. Times, Nov. 1, 2011, http://www.nytimes.com/2011/11/02/arts/design/artists-file-suit-against-sothebys-christies-and-ebay.html?pagewanted=all (last viewed, January 24, 2012).  A 1986 survey of artists conducted by the Bay Area Lawyers for the Arts found that 32% of respondents "said dealers had refused to give them the name or address of the buyer or even the resale price, despite their right under the [CRRA] to assign collection of the royalty to another."  Reddy at 523.

U.S. 366, 370–71 (1976)).  While "not every exercise of state power with some impact on interstate commerce is invalid," a state law must even-handedly regulate to "effectuate a legitimate public interest," and its impact on interstate commerce must only be "incidental."  *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

**C.    Applicability of the Dormant Commerce Clause**

As an initial matter, although Plaintiffs rely heavily upon the Ninth Circuit's decision in *Morseburg v. Baylon*, 621 F.2d 972 (9th Cir. 1980), arguing that it "rejected constitutional challenges brought against the [CRRA]," the Court finds that *Morseburg* does not control here.  (Opp'n 1.)  *Moresburg* did not involve a dormant Commerce Clause challenge to the CRRA; rather, it involved preemption, Contracts Clause, and due process challenges.  *Moresburg*, 621 F.2d at 974–75. Moreover, the *Morseburg* court explicitly stated that its decision "concern[ed] the preemptive effect of the 1909 [Copyright] Act *only*."  *Id.* at 975 (emphasis added). As such, the Court addresses the dormant Commerce Clause issue as one of first impression and is not bound by *Morseburg*.[4]

---

[4] The Court also notes that its decision in *Baby Moose Drawings, Inc. v. Valentine*, No. 11–00697, 2011 WL 1258529 (C.D. Cal. Apr. 1, 2011), a case also involving a challenge to the CRRA, was decided solely on preemption grounds—indeed the parties did not fully brief the issue of whether the CRRA violated the Commerce Clause—and thus is not relevant to the instant dormant Commerce Clause challenge.

A state statute implicates the dormant Commerce Clause if the activity it regulates could likewise be regulated by Congress. *Manning*, 301 F.3d at 993. Thus, the Court must first determine whether the CRRA regulates an activity subject to federal control. *See id.* at 992. The Supreme Court has "identified three broad categories of activity that Congress may regulate under its commerce power." *United States v. Lopez*, 514 U.S. 549, 558 (1995). Congress may regulate (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) "those activities that substantially affect interstate commerce." *Id.* at 558–59.

### 1.     Works of Fine Art Constitute "Things" in Interstate Commerce

First, the Court finds that where works of fine art are sold from one state into another, each piece of fine art itself constitutes a "thing" in interstate commerce. Therefore, Congress may regulate such transactions under the Commerce Clause. *See Lopez*, 514 U.S. at 558–59.

### 2.     The CRRA Substantially Affects Interstate Commerce

Second, the Court finds that the CRRA substantially affects interstate commerce. One factor that a Court should "consider when evaluating whether a law has a 'substantial effect' on interstate commerce [is] . . . whether the statute has anything to do with 'commerce or any sort of economic enterprise, however broadly one might define those terms.'" *San Luis & Delta-Mendota Water Auth. v. Salazar*,

638 F.3d 1163, 1174 (9th Cir. 2011) (quoting *Lopez*, 514 U.S. at 561).  This factor is surely met.  In fact, the Ninth Circuit has specifically described the CRRA as "an *economic* regulation to promote artistic endeavors generally."  *Moresburg*, 621 F.2d at 979 (emphasis added).

The Supreme Court has held that Congress may exercise its Commerce Clause power so long as "in the aggregate the economic activity in question would represent a general practice . . . subject to federal control."  *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56–57 (2003) (alteration in original) (quotation marks and citation omitted); *see also San Luis*, 638 F.3d at 1175 ("When a statute is challenged under the Commerce Clause, courts must evaluate the aggregate effect of the statute (rather than an isolated application) . . . .").  When the number of art sale transactions throughout the United States that the CRRA purports to regulate are considered in the aggregate, the Court finds little doubt that the CRRA has a "substantial effect" on interstate commerce such that Congress could regulate the activity.  *Citizens Bank*, 539 U.S. at 56–57.  Therefore, the Court finds that the dormant Commerce Clause applies to the CRRA.

**D.**      **Whether the CRRA Violates the Dormant Commerce Clause**

Although the Court has concluded that the CRRA implicates the dormant Commerce Clause, this "does not answer the question of whether the [CRRA]

*violates* the dormant Commerce Clause." *Manning*, 301 F.3d at 995 (emphasis added).

The Supreme Court has "outlined a two-tiered approach" to analyzing state economic regulations under the dormant Commerce Clause:

> When a statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Valley Bank of Nev. v. Plus Sys., Inc.*, 914 F.2d 1186, 1189 (9th Cir. 1990) (quoting *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986)); *see also Miller*, 10 F.3d at 638; *S.D. Myers, Inc. v. City and Cnty. of S.F.*, 253 F.3d 461, 466 (9th Cir. 2001).

Therefore, the Court "must first ask whether the Statute: 1) directly regulates interstate commerce; 2) discriminates against interstate commerce; or 3) favors in-state economic interests over out-of-state interests." *Miller*, 10 F.3d at 638. If it does any of these things, "it violates the Commerce Clause per se, and we must strike it down without further inquiry." *Id.*

**1.    The CRRA Violates the Commerce Clause Per Se**

The Supreme Court has held that "a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." *Healy*, 491 U.S. at 336.  This is so "whether or not the commerce has effects within the state." *Id.*  The Ninth Circuit has held that "[s]uch a statute is invalid per se, regardless of whether the state intended to inhibit interstate commerce." *Valley Bank*, 914 F.2d at 1190.  The "critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Healy*, 491 U.S. at 336 (quoting *Edgar*, 457 U.S. at 642–43 (1982) (plurality opinion)).

The Court finds that the CRRA explicitly regulates applicable sales of fine art occurring wholly outside California.  *See* Cal. Civ. Code § 986(a).  Under its clear terms, the CRRA regulates transactions occurring anywhere in the United States, so long as the seller resides in California.  *Id.*  Even the artist—the intended beneficiary of the CRRA—does not have to be a citizen of, or reside in, California.  Cal. Civ. Code § 986(c)(1).

The following example illustrates the CRRA's problematic reach: Assume a California resident places a painting by a New York artist up for auction at Sotheby's in New York, and at the auction a New York resident purchases the painting for $1,000,000.  In such a situation, the transaction that the CRRA

regulates—the one between the New York auction house and the New York purchaser[5]—occurs wholly in New York.  Despite the fact that even the artist receiving the royalty is a New York resident, the CRRA reaches out to New York and regulates the transaction by mandating that Sotheby's (1) withhold $50,000 (i.e., 5% of the auction sale price); (2) locate the artist; and (3) remit the $50,000 to the New York artist.  Cal. Civ. Code § 986(a)(1).  Should Sotheby's in New York fail to comply, the New York artist may bring a legal action under California law (the CRRA) to recover the applicable royalty.  Cal. Civ. Code § 986(a)(3).  If the artist cannot be located, Sotheby's must send the money withheld in the transaction to the California Arts Council.  *Id.*

California's own Legislative Counsel recognized this problem with the CRRA when the law was being considered in August of 1976.  (Russell Decl. Ex. 5, at 32.)[6]  In an opinion letter, Legislative Counsel George H. Murphy wrote that "[w]hile

---

[5] Notably, the CRRA does *not* purport to regulate any potential agreement between a seller and the seller's agent; rather, it solely regulates the actual sale.

[6] The Court received Defendants' Request for Judicial Notice (docket no. 18).  The Court grants the Request to take judicial notice of the legislative history of the CRRA, including, *inter alia*, prior versions of the bill, amendments, committee reports, and the written recommendations of the legislative counsel.  *See, e.g.*, *Territory of Alaska v. Am. Can Co.*, 358 U.S. 224, 226–27 (1959) (taking judicial notice of, and analyzing, legislative history of a bill); *Chaker v. Crogan*, 428 F.3d 1215, 1223 n. 8 (9th Cir. 2005) (same); *In re Reeves*, 35 Cal. 4th 765, 777 n. 15 (2005) (same).  The Court declines to take judicial notice of any other documents as they are unnecessary to this decision.

The Court, however, does not rely upon the judicially noticed documents in reaching its conclusions on the constitutionality of the CRRA.  It uses them simply for the purpose of adding context to the analysis, and in considering severability.  *See, e.g.*, *Traverso v. People ex rel. Dep't*

(footnote continued)

1  the state has a legitimate local interest in furthering the fiscal rights of artists within

2  this state, we find little such interest where the artist resides out of the state or

3

4  country."  (Id.)  The Legislative Counsel further advised that the application of the

5  CRRA to "out-of-state sales . . . would be invalid under the commerce clause."  (Id.

6  at 31.)

7

8          Plaintiffs' reliance on *S.D. Myers* is misplaced.  (Opp'n to Jt. Mot. at 12.)  In

9  *S.D. Myers*, the Ninth Circuit confronted a wholly different set of facts.  There, a

10 San Francisco ordinance required that "contractors with the City provide

11

12 nondiscriminatory benefits to employees with registered domestic partners."  253

13 F.3d at 465.  An Ohio-based company filed suit, arguing that the ordinance was

14

15 invalid under, *inter alia*, the Commerce Clause.  *Id.* at 466.  In upholding the statute

16 from the Commerce Clause challenge, the Ninth Circuit relied on the fact that "the

17

18 Ordinance [would] affect an out-of-state entity only after that entity [had]

19 affirmatively chosen to subject itself to the Ordinance by contracting with the City."

20 *Id.* at 469.  The Court found important that the Ordinance was imposed only by an

21

22 affirmative contract, "rather than by legislative fiat."  *Id.*[7]

23 _____

24 *of Transp.*, 46 Cal. App. 4th 1197, 1206, 1209 n. 11 (1996); *People v. Soto*, 51 Cal. 4th 229, 239–40 (2011); *Carter v. Charter Coal Co.*, 298 U.S. 238, 312–17 (1936).

25      [7] Plaintiffs' reliance on *Gravquick A/S v. Trimble Navigation Int'l Ltd.,* 323 F.3d 1219, 1224 (9th Cir. 2003), is similarly misplaced.  There, as in *S.D. Myers*, the Ninth Circuit relied on the

26 fact that the relevant state law applied only "because the parties chose to be governed by California law" in a contract.  *Id.* at 1224.

27

28

Here, on the other hand, the Complaints contain no allegation that Defendants affirmatively chose to be governed by California law.  Instead, Defendants, both New York corporations, find themselves subject to the law of California by virtue of selling art that is owned by a California seller—even if the transaction takes place wholly in New York, and even if the beneficiary of the 5% royalty is a New York artist.  Cal. Civ. Code § 986(c)(1).

For these reasons, the Court finds that the CRRA has the "practical effect" of controlling commerce "occurring wholly outside the boundaries" of California even though it may have some "effects within the State."  *Healy*, 491 U.S. at 336. Therefore, the CRRA violates the Commerce Clause of the United States Constitution.

**E.      The Entire Statute Must Fall**

Although the CRRA contains a severability provision, the Court nonetheless agrees with Defendants that the offending portions of the CRRA cannot be severed, and thus the entire statute must fall.  Cal Civ. Code § 986(e) ("If any provision of this section or the application thereof to any person or circumstance is held invalid for any reason, such invalidity shall not affect any other provisions or applications of this section which can be effected, without the invalid provision or application, and to this end the provisions of this section are severable."); (Jt. Reply 12).

The Supreme Court has held that "a court should refrain from invalidating more of [a] statute than is necessary." *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984). The established standard for determining severability is: "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Miller*, 10 F.3d at 640 (emphasis omitted) (quoting *Buckley v. Valeo*, 424 U.S. 1, 108–109 (1976) (per curiam)). In *Alaska Airlines, Inc. v. Brock*, the Supreme Court elaborated on this standard, holding that "[t]he more relevant inquiry in evaluating severability is whether the statute will function in a manner consistent with the intent of Congress [i.e., the legislature]." 480 U.S. 678, 685 (1987).

The legislative history of the CRRA, debated as Assembly Bill 1391, reveals that the legislature abandoned the initial version of the CRRA that purported to regulate *only* sales that took place *in* California. (*See* Russell Decl. Ex. 1.)

Assembly Bill 1391, as introduced on April 2, 1975, provided for a resale royalty only where "an original work of fine art [was] sold at an auction or by a gallery or museum *in California*." (Russell Decl. Ex. 1, at 8) (emphasis added). The bill was then amended, to ensure the CRRA applied "[w]henever a work of fine art [was] sold *and the buyer or the seller resides in California or the sale takes place* in California." (Russell Decl. Ex. 4, at 22) (emphasis in original). The bill

17

was then amended again, deleting the reference to California buyers, but continuing to require a resale royalty for sales outside of California where the "seller resides in California." (Russell Decl. Ex. 6, at 34.) After the initial introduction of the bill, all amended versions were consistent in one respect: they applied to sales taking place outside California so long as the seller resided in California.

Moreover, the legislature endorsed the CRRA's extraterritorial reach, despite the fact that California's Legislative Counsel advised both Assemblyman Sieroty and then-Governor Brown, in opinion letters, that the bill "would constitute an undue burden on interstate commerce in contravention of the Federal Constitution in its application to sales which occur outside the State of California." (Id. Ex. 5, at 26; Ex. 7, at 42.) As Defendants pointed out in oral argument, the reason for the legislature's decision seems obvious: were the CRRA to apply *only* to sales occurring *in* California, the art market would surely have fled the state to avoid paying the 5% royalty. (Docket no. 39 at 21:10–17.)

For these reasons, the Court finds that the California legislature "would not have enacted" the CRRA without its extraterritorial reach. *Buckley*, 424 U.S. at 108–109. Were the Court merely to sever the extraterritorial provisions of the statute, it would create a law that the legislature clearly never intended to create. The Court declines to do so.

Therefore, the Court finds that the CRRA must fall in its entirety.

**IV.**

**CONCLUSION**

For the foregoing reasons, the Court finds that the California Resale Royalties Act, Cal. Civ. Code § 986, violates the Commerce Clause of the United States Constitution.  Because the Court finds that the offending provisions cannot be severed, the entire statute is struck down.  Therefore, Defendants' Joint Motion to Dismiss the Complaints (docket no. 17) is **GRANTED with prejudice**, as amendment would be futile.

**IT IS SO ORDERED.**

Dated:  May 17, 2012

_____
Jacqueline H. Nguyen
Circuit Judge, United States Court of
Appeals for the Ninth Circuit, sitting by
designation